UNITED STATES of America,
Plaintiff–Appellee,

v.

Emil A. JOHNSON, Defendant–Appellant.

No. 92–4009.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 6, 1993.

Decided Nov. 10, 1993.

Rehearing and Suggestion for Rehearing
En Banc Denied Feb. 3, 1994.

Bradley D. Barbin, David J. Bosley (argued and briefed), Office of the U.S. Atty., Columbus, OH, for plaintiff-appellee.

David H. Bodiker (argued and briefed), Bodiker & Holland, Columbus, OH, for defendant-appellant.

Before: KEITH and KENNEDY, Circuit Judges; and JORDAN, District Judge.*

KENNEDY, Circuit Judge.

Defendant Emil A. Johnson appeals from the order of the District Court denying his motion to suppress evidence seized by local and federal law enforcement officials during a warrantless search of his home. On appeal, defendant contends that there were no exigent circumstances justifying the warrantless entry and search of his residence. For

---

* The Honorable Leon Jordan, United States District Judge for the Eastern District of Tennessee, sitting by designation.

the reasons set forth below, we affirm the denial of the motion to suppress.

## I.

The record before the District Court disclosed the following as the basis for the search of defendant's home. On January 11, 1991, at approximately 2:20 p.m., Officers David Weisgerber and Bruce Orlov of the Columbus Police Department were dispatched to defendant's residence at 83 McMillan Street after a neighbor called to report a burglary in progress at that residence. The neighbor reported seeing individuals crawl through the window. Upon arrival at the residence, the officers discovered that the doors were locked and that a kitchen window had a broken pane. Their knocks were not responded to.

As the officers approached the broken window, they observed a black female, later identified as Angela Lewis, defendant's girlfriend, and a black male inside the house. The officers, with weapons drawn, called the individuals to the broken window and asked them if they lived there. The female (Lewis) stated that she lived there but that she could not open the door because she did not have a key.[1] She also had no identification. In response to an inquiry by the police officers, Lewis stated that there were no other people inside the house. After directing the two individuals to climb out through the window, the officers secured them in a police vehicle.

The officers then returned to the house where they observed two more women inside. These women were subsequently identified as friends of Lewis. According to Lewis, one of the women had brought some crack cocaine and a pipe to the house and had attempted to hide these items when the police arrived. Consequently, the women did not reveal themselves to the police immediately and were acting in a nervous and suspicious manner. The officers directed these women to leave the house through the window and then secured them in a police vehicle. Thereafter, the officers decided to enter the house to make sure no one else was inside.

Officer Weisgerber entered the house through the window and forced open the door for the other officers who had arrived on the scene. The officers then walked through the residence to determine if any other individuals were inside. While doing so, the officers observed, in plain view, ammunition, gun clips, a dynamite wick or fuse, two pipes with end caps, books on how to make explosive devices, and a piece of white PVC pipe with tape on the end. Officer Weisgerber also observed a locked box upstairs with a sign on it which stated: "This contains five pounds of black powder and if moved, will explode." While in the residence, the officers did not touch, pick up or seize any of the items observed in plain view. After leaving the house, the officers notified the bomb squad of a possible booby-trap situation. The officers also made a radio request for the owner to come to the house or for the police to bring him there. They obtained his name and place of employment from Lewis.

Members of the Columbus Fire Department bomb squad arrived at the residence and Lieutenant McConaha proceeded to go inside. He observed metal pipes, a model rocket or cannon fuse, black powder, ammunition and books on explosives. He also observed the piece of white PVC pipe under a desk in the bedroom as well as the locked box which he described as a gun case and note indicating that it would blow up. All of these items were in plain view and Lt. McConaha did not touch or seize anything. Lt. McConaha concluded that there was a real risk that explosive devices might be located on the premises since all of the ingredients for making a bomb were present. After conferring with the Columbus Police, Lt. McConaha decided that the dangerousness of the situation called for the involvement of the Bureau of Alcohol, Tobacco and Firearms ("BATF").

Agent Dan Ozbolt of the BATF arrived at the residence and was escorted through by McConaha. Agent Ozbolt observed the vari-

---

1. Lewis testified that she showed the officers some mail with her name on it but the officers testified that they did not recall her doing so.

The District Court found that Lewis failed to show the officers any identification.

ous items in the house, including the gun safe and the white PVC pipe with duct tape over one end and a hole in the center of the tape. Agent Ozbolt picked up the pipe to examine it because he suspected it might be a pipe bomb in the state of being manufactured. A BATF agent then called one of the explosive technologists at the BATF lab in Washington, D.C. who confirmed that the items found in the residence could constitute the component parts of a pipe bomb.

Upon defendant's arrival at the scene, he was asked and refused to consent to a search of his home. He declined to press charges against any of the persons who had been in the house and they were released at the scene. In view of defendant's refusal to consent to a search, Agent Ozbolt prepared an affidavit and obtained a search warrant from a magistrate judge. During the execution of the search warrant, agents seized the piece of white PVC pipe with gray duct tape and a hole in the tape. The pipe was sent to the BATF lab in Washington where further analysis revealed it to be a silencer.

On September 12, 1991, defendant was charged with one count of knowingly receiving and possessing an unregistered silencer, in violation of 26 U.S.C. § 5861(d) and § 5871, and one count of knowingly receiving and possessing a silencer not identified by a serial number, in violation of 26 U.S.C. § 5861(i) and § 5871.

Defendant filed a Motion to Suppress the evidence seized from his home claiming that the agents did not have sufficient probable cause to believe that an offense had been committed and that no exigent circumstances existed to justify the warrantless entry and search. The District Court denied the motion.

Defendant then withdrew his previously entered not guilty pleas and entered conditional guilty pleas to counts 1 and 2 of the indictment. On September 18, 1992, defendant was sentenced to twenty-one (21) months imprisonment on counts 1 and 2, to be served concurrently, and to be followed by a two-year period of supervised release.

## II.

Defendant contends that the District Court erred in concluding that there were exigent circumstances justifying the warrantless entry and "protective sweep" of his residence which resulted in the discovery and seizure of the silencer. It is well settled that "[a]bsent exigent circumstances, police officers may not enter an individual's home or lodging to effect a warrantless arrest or search." *United States v. Morgan,* 743 F.2d 1158, 1161 (6th Cir.1984) (citing *Payton v. New York,* 445 U.S. 573, 590, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639 (1980)), *cert. denied,* 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985). In fact, "the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *United States v. Sangineto–Miranda,* 859 F.2d 1501, 1511 (6th Cir.1988) (quoting *United States v. United States Dist. Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 2135, 32 L.Ed.2d 752 (1972)). Therefore, the Supreme Court has declared that warrantless entries and searches inside a residence are "presumptively unreasonable," *Payton,* 445 U.S. at 586, 100 S.Ct. at 1380, and the police bear a "heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." *Welsh v. Wisconsin,* 466 U.S. 740, 750, 104 S.Ct. 2091, 2098, 80 L.Ed.2d 732 (1984); *Morgan,* 743 F.2d at 1162 ("the burden is on the government to demonstrate exigency"). This Court has stated that "[t]he exigent circumstances exception relies on the premise that the existence of an emergency situation, demanding urgent police action, may excuse the failure to procure a search warrant." *United States v. Radka,* 904 F.2d 357, 361 (6th Cir.1990).

This Court reviews *de novo* the District Court's legal conclusions with respect to the issue of exigency; however, the court's factual findings on the existence of exigent circumstances will be disturbed only if they are clearly erroneous. *Id.* In reviewing the District Court's finding that exigent circumstances existed at the time of the warrantless search, we consider the totality of the circumstances and the "inherent necessities of the situation at the time." *Id.* at 362 (quoting *United States v. Rubin,* 474 F.2d 262, 268

(3d Cir.), *cert. denied,* 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973)).

### A. Police Officers' Initial Entry

■ Exigent circumstances justify a warrantless entry into a residence only where there is also probable cause to enter the residence. *Sangineto–Miranda,* 859 F.2d at 1511 n. 6. "The establishment of probable cause 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *United States v. Ogbuh,* 982 F.2d 1000, 1002 (6th Cir.1993). The officers here were responding to a call reporting a possible burglary in progress. Upon arrival at defendant's residence they discovered a broken window and two individuals inside. One of these individuals was unable to satisfy the officers that she lived there. Although she testified she showed them mail addressed to a Ms. Lewis, she had nothing to identify herself as Ms. Lewis. The fact that there was mail in the house addressed to an occupant did not establish her identity. Thus, although the court made no finding on whether or not she showed the officer the mail, we see no need to remand for a finding of that issue. This same individual lied to the officers regarding the number of people inside the residence. Several of the individuals were acting suspiciously. Thus, the officers clearly had probable cause to enter the residence.

The Supreme Court has recognized only a few emergency circumstances excusing the need for a warrant, namely, hot pursuit of a fleeing felon, destruction of evidence, and fire on the premises. *See Sangineto–Miranda,* 859 F.2d at 1511 (and cases cited therein). Several of our sister circuits, however, have upheld warrantless searches conducted during burglary investigations under the rubric of exigent circumstances. For example, in *United States v. Valles–Valencia,* 811 F.2d 1232 (9th Cir.), *amended on other grounds,* 823 F.2d 381 (9th Cir.1987), the police responded to a report that strangers were parked in front of a nearby house, the owners of which were on vacation. The strangers could not adequately explain their presence and a front window showed signs of being pried open. The police also smelled marijuana. Suspecting that a burglary was in progress, the police entered the house and discovered a variety of controlled substances. The Ninth Circuit upheld the search after finding that exigent circumstances justified the initial warrantless entry into the house. Specifically, the Court determined that:

> The circumstances known to the officers supported probable cause to enter the building to learn what was happening. After the officers entered the upstairs and arrested [several defendants], they were justified in conducting a protective sweep of the remaining rooms. They reasonably believed that "there might be other persons on the premises who could pose some danger to them."

*Id.* at 1236 (quoting *United States v. Gardner,* 627 F.2d 906, 909–10 (9th Cir.1980)). *See also Reardon v. Wroan,* 811 F.2d 1025, 1030 (7th Cir.1987) (case involving police officers' entry and search of a fraternity house in which court found that "[d]efendants were faced with a call reporting a burglary in progress during a time of year when [ ] students were on break and burglaries were known to occur more frequently. And when they arrived they found a single car in the driveway and the door to the residence unlocked. Therefore, ... we conclude based on these facts that the exigency requirement was satisfied as a matter of law."); *United States v. Singer,* 687 F.2d 1135, 1144 (8th Cir.1982), *adopted in relevant part,* 710 F.2d 431 (8th Cir.1983) (en banc) (upholding warrantless entry of residence where circumstances indicated burglary in progress); *United States v. Estese,* 479 F.2d 1273, 1274 (6th Cir.1973) (upholding warrantless search where police observed signs that apartment door had been pried open).

Similarly, in the case at issue, the police officers responding to the neighbor's report had every reason to believe that a burglary was in progress. As the District Court found:

> The telephone report was corroborated by the officers' observation of a broken window. The people inside the house did not respond to the officers' knocking and had to be ordered to approach the window. Ms. Lewis could not provide identification

or a key to open the doors. She lied to the officers about whether there were other people in the house. Her companions, by her own admission, were acting in a suspicious manner. Although defendant relies heavily on the fact that Ms. Lewis was dressed in night clothes, this is not dispositive of the issue of whether the police should have accepted her representations that she was a resident. Under the circumstances, the police could reasonably have concluded that she was acting as an accomplice to the burglary, or that she was under duress. The police reasonably concluded that other burglary suspects might still be on the premises, and that a protective sweep of the residence was warranted in order to insure the security of the owner's property. Based upon the facts before them, the police acted reasonably in deciding to enter the residence without first obtaining a warrant.

These findings are not clearly erroneous. The circumstances confronting the officers justified their warrantless entry into the residence because "[i]t would defy reason to suppose that [the officers] had to secure a warrant before investigating, leaving the putative burglars free to complete their crime unmolested. It is only 'unreasonable' searches and seizures that the fourth amendment forbids." *Singer*, 687 F.2d at 1144.

Additionally, as recognized by the District Court, the officers' cursory check of the residence was analogous to a "protective sweep" which is "a quick and limited search of a premise, incident to an arrest and conducted to protect the safety of police officers and others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *United States v. Rigsby*, 943 F.2d 631, 637 (6th Cir.1991) (quoting *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990)), *cert. denied*, —— U.S. ——, 112 S.Ct. 1269, 117 L.Ed.2d 496 (1992). Here, it is undisputed that the officers limited their search to places where persons could be hiding. Thus, the scope of the intrusion did not exceed that justified by the exigencies presented. *Mincey v. Arizona*, 437 U.S. 385, 393, 98 S.Ct. 2408, 2413–14, 57 L.Ed.2d 290 (1978). The officers did no more than secure the premises to ensure the protection of everyone on the scene and to prevent the loss or destruction of the owner's property. If investigating a potential burglary in progress is part of a police officer's routine community caretaking functions, *Singer*, 687 F.2d at 1144, then the officers' actions in this case cannot be deemed unreasonable. *See Reardon*, 811 F.2d at 1029 ("Where, as here, the police are called upon to respond to a crime reported to be in progress, we recognize that police judgments should be afforded an extra degree of judicial deference."). We agree that the "important responsibility of the police to investigate reported burglaries must be balanced against the serious invasions of privacy such searches entail." *United States v. Erickson*, 991 F.2d 529, 533 (9th Cir.1993). As the case law demonstrates, "the exigent circumstances exception to the warrant requirement adequately accommodates these competing interests." *Id.* Here, the District Court did not err in finding such exigent circumstances.

### B. Bomb Squad and BATF Entries

■ More problematic than the first entry and the initial "protective sweep" by the Columbus Police Officers are the subsequent entries by the bomb squad and BATF agents. To the extent that these officers should have postponed their entries until warrants had been obtained, defendant argues that the entries violated his Fourth Amendment rights. Following the initial entry into defendant's home, the police officers observed metal pipes, ammunition, black powder, fuses, books on explosive devices, and the threatening note on the gun safe. These items led the officers to believe that a real threat to public safety was presented by the potential presence of explosive devices on the premises. Accordingly, they called in the bomb squad, who in turn called in the BATF because of the seriousness of the situation. In light of what the officers found in defendant's residence, located in a residential neighborhood, the District Court's findings that the entries of the bomb squad and BATF agents were valid entries based upon exigent circumstances and that they "resulted in no greater intrusion on defendant's privacy than the initial valid entry of the

Columbus police officers," are not clearly erroneous.[2]

In a similar case involving a search of a residence during the investigation of a burglary in progress and then subsequent warrantless entries and searches by other law enforcement agents, the Ninth Circuit recognized that:

> Even if exigent circumstances no longer supported these further intrusions, or if these intrusions exceeded the scope of the rationale exempting them from the warrant requirement, appellants have not shown how evidence traceable to these later intrusions prejudiced their defense. The prosecution obtained all the later discovered evidence under a warrant. Officers did not use the cumulative evidence observed by others in obtaining the warrant. Evidence legitimately observed during the protective sweep supported the warrants. Appellants do not claim that observations by other officers were needed to enhance the affidavits in support of the search warrants. Because evidence obtained independently of any possibly illegal searches amply corroborated the search warrants, they would stand whether or not the redundant searches were illegal as abstract questions of fourth amendment law.

*Valles–Valencia,* 811 F.2d at 1237. Here, Lt. McConaha and Agent Ozbolt observed only what the police officers had already observed during the initial entry. The evidence that supported the affidavit for the search warrant was all legitimately observed during the initial entry. The only (new) information Agent Ozbolt's participation added to the affidavit was his discussion with an explosive technologist (at the ATF lab) that the items found in the residence constitute a bomb when assembled. However, considering the pipes, fuses, powder, and books on how to make explosive devices found by the officers, the information from the bomb technician was not critical to the issuance of the warrant. Consequently, the police officers could have obtained the search warrant irrespective of the subsequent searches.

■ Unlike the situation in *Valles–Valencia,* however, Agent Ozbolt, and not one of the police officer's involved in the initial search, prepared the affidavit in support of the search warrant. Our review of the affidavit, however, reveals that it describes the suspicious items in defendant's home as observed by the Columbus Police Officers.[3] Moreover, even if the affidavit was defective, suppression of the evidence would not have been required. "The 'good faith' exception set forth in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), would save the evidence." *United States v. Shields,* 978 F.2d 943, 946 (6th Cir.1992). In *Leon,* the Supreme Court held that evidence is admissible if it is "seized by officers reasonably relying on a warrant issued by a detached and neutral magistrate." *Leon,* 468 U.S. at 913, 104 S.Ct. at 3415. Here, the record indicates that based upon the items discovered in defendant's home, the Columbus Police Officers, bomb squad members, and ATF agents were under the impression that they were responding to exigent circumstances. When defendant refused to consent to a more thorough search, a search warrant was obtained. We find that the officers reasonably and in good faith relied on this

---

2. Specifically, the District Court found that "Lieutenant McConahay [sic] looked at the gun safe and could not rule out the possibility that it was rigged with five pounds of black powder, which could have caused substantial damage to the neighborhood if detonated."

3. Specifically, the affidavit reads:
   On 1–11–91, Officers of the Columbus Police Department were dispatched to a burglary call at 83 McMillan St., Columbus, Ohio. This call was received from a neighbor who saw people enter this residence through a window.... While searching this residence for the possibility of additional suspects, officers saw a vault in an upstairs bedroom with a note indicating that it contained five pounds of black powder that would explode if tampered with.
   Observed in plain view in the living room were large amounts of high powered ammunition ... and a galvanized pipe ... secured with an end cap. Observed in close proximity to this pipe were two cans of black powder, a package of fuse, and two books entitled Principles of Improvised Explosive Devices and Improvised Munitions Blackbook, Volume II.
   Observed in plain view in an adjacent bedroom was a white PVC pipe.... One end of this pipe was covered with tape, and a hole was punched in the middle of said tape.

search warrant in seizing the suspicious piece of pipe.

Consequently, the discovery of the silencer in the living room of defendant's residence constitutes the fortuitous and inevitable result of proper police procedure under the circumstances. Because exigent circumstances justified the officers' initial warrantless entry into defendant's home (to conduct a protective sweep), the subsequent searches and seizure pursuant to a facially valid search warrant were lawful.

### III.

Accordingly, the District Court's order denying defendant's motion to suppress is **AFFIRMED**.

KEITH, Circuit Judge, dissenting.

Because I disagree with the majority's view of the facts and its expansive definition of "exigent circumstances," I must respectfully dissent.

Because the exceptions to the warrant requirement are "few in number and carefully delineated," the police bear a heavy burden in demonstrating exceptions such as exigent circumstances. *Welsh v. Wisconsin,* 466 U.S. 740, 744–750, 104 S.Ct. 2091, 2094–2098, 80 L.Ed.2d 732 (1984). The Supreme Court has recognized only "hot pursuit" of a fleeing felon,[1] destruction of evidence,[2] and an ongoing fire[3] as exigent circumstances urgent enough to justify a warrantless search of a home.

Acknowledging that in this situation there was no "hot pursuit," fear of destruction of evidence or ongoing fire, the majority departs from previous Supreme Court and Sixth Circuit rulings by validating a warrantless search conducted during a burglary investigation under the guise of "exigent circumstances." Such a holding cripples the Fourth Amendment. It resembles an Orwellian scenario where officers, based on an "anonymous tip," approach a home, and upon an occupant's inability to produce identification, arrest the resident and search her home.

Regardless of the departure from established precedent, the majority's claim that the police officers "had every reason to believe that a burglary was in progress" is unacceptable. Angela Lewis was wearing pajamas and a bathrobe when police approached the house. Evidence indicates Lewis complied with the officers' request for mail to establish her residence, although, not surprisingly, the officers are unable to recall whether or not she did. The officers are also unable to recall whether one of them conversed with next door neighbor Jeannine LaVoi, who testified that before the officers entered Johnson's house she identified Lewis as a resident and stated that the owner, Emil Johnson, was presently at work at United Parcel Service.

The majority justifies the search as one "conducted to protect the safety of police officers and others" and that Lewis "could have" been under duress. I disagree. The circumstances presented no violence or danger to other individuals. Furthermore, after placing Lewis in custody, taking her out of "danger," officers could have questioned her but failed to do so.

The majority also claims that a protective sweep of the residence was necessary to insure the security of the owner's property. The majority fails to realize that under the subterfuge of protecting property, the government invaded the security and privacy of the owner's property. While investigating a potential burglary is one of a police officer's routine functions, invading the sanctity of homes is not.

Police officials are not free to create exigent circumstances to justify their warrantless searches. *United States v. Morgan,* 743 F.2d 1158, 1163 (6th Cir.1984), *cert. denied,* 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 490

---

1. *United States v. Santana,* 427 U.S. 38, 42–43, 96 S.Ct. 2406, 2409–10, 49 L.Ed.2d 300 (1976); *Warden v. Hayden,* 387 U.S. 294, 298–299, 87 S.Ct. 1642, 1645–1646, 18 L.Ed.2d 782 (1967).

2. *Schmerber v. California,* 384 U.S. 757, 770–771, 86 S.Ct. 1826, 1835–1836, 16 L.Ed.2d 908 (1966).

3. *Michigan v. Tyler,* 436 U.S. 499, 509, 98 S.Ct. 1942, 1950, 56 L.Ed.2d 486 (1978).

(1985). By refusing to simply call the owner, the officers unreasonably fabricated in their minds exigent circumstances to justify their warrantless intrusion. To avoid the irrationality of their unilateral decision, the officers could have easily detained the four inhabitants, interrogated them, and contacted the owner. Officer Orlov recalled that Lewis said the owner worked for United Parcel Service. No call, however, was placed to verify this information. Minor inquiry and investigation would have revealed Lewis had every right to be in the home. We should not reward an officer's inaptitude and inaction with a license to freely enter citizens' homes without a warrant. The Fourth Amendment of our Constitution, infinitely precious to our individual rights and liberties, deserves more respect than incorrect speculation based upon incomplete investigation by overanxious officers to which the majority defers.

"The point of the Fourth Amendment, which often is not grasped by zealous officers ... consists in requiring that ... inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States,* 333 U.S. 10, 13–14, 68 S.Ct. 367, 368–69, 92 L.Ed. 436 (1948). It has long been recognized that police officers, due to their engagement and passion, often ignore the Fourth Amendment and engage in warrantless invasions of homes without questioning neighbors, calling an owner or interrogating suspects. Acknowledging this tendency, the Constitution requires officers to obtain a warrant from an impartial and reasonable magistrate. When we allow police to assume decisions properly reserved for magistrates, as in this situation, officers become an adversary of not only criminals, but of the Constitution and the society it protects. The majority's expansion of the exigent circumstances doctrine vests officers with a frightening abundance of discretion and will inevitably lead to a corrosion of the Fourth Amendment. Numerous invasions of privacy will result from imaginary and unsubstantiated burglaries fabricated from the combination of officers' active imaginations, wary suspicions, and arrogance.

The majority recognizes that after the officers entered the house and discovered their burglary speculations were unfounded, the two subsequent warrantless entries by Lt. McConaha of the Columbus Fire Department bomb squad and Agent Ozbolt of the Bureau of Alcohol, Tobacco and Firearms were problematic. Further searches should have been postponed until warrants had been obtained, as it was evident there was no burglary in progress. The fact that three searches were conducted before a warrant was obtained reveals the zeal, conceit and total disregard for the Fourth Amendment displayed by these officers throughout the entire episode.

Because the initial entry of the residence was unlawful, the subsequent warrantless searches and search warrant were invalid, and the evidence eventually seized under the search warrant must be suppressed as the fruit of that original illegality. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The entry was unjustified and everything that flowed from it was thereafter tainted.