25 F.3d 1051
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Rafael ESTRADA, Defendant-Appellant.
 No. 93-2057.
 United States Court of Appeals, Sixth Circuit.
 May 16, 1994.
 
 Before MERRITT, Chief Judge, GUY and BOGGS, Circuit Judges.
 PER CURIAM.
 
 
 1
 Defendant, Rafael Estrada, entered a conditional guilty plea to a one-count indictment charging him with possession of cocaine with intent to distribute. 21 U.S.C. Sec. 841. The conditional plea preserved the issue of the trial court's denial of Estrada's motion to suppress evidence.
 
 
 2
 On appeal, defendant argues he was illegally stopped in his automobile and that the cocaine found on his person should not be admitted into evidence. He also argues that a subsequent, warrantless entry into his residence and a subsequent search, allegedly based on consent, were both improper.
 
 
 3
 Our review of the record convinces us the district court properly denied the motion to suppress. Although we will address both issues raised by defendant, we note that no narcotics were seized at the residence and the seized drug paraphernalia were of little consequence. Thus, even if we found that the search of the residence was improper, we nevertheless would find only harmless error.[1]
 
 I.
 
 4
 United States Border Patrol Agent Donald Buechner received a tip relating to cocaine distribution from a Cuban alien he had earlier investigated on other matters. The informant told Buechner that cocaine was being sold in two Detroit, Michigan, bars--Carnival and El Chaparral--by a man named "Rafael." The informant also was able to tell the agent that Rafael drove a red Blazer, would often go to his home to get the cocaine and then bring it back to the bar, and that he transported the cocaine in his sock.
 
 
 5
 The agent took the informant to the Carnival Bar, and the informant pointed out Rafael's car, which turned out to be a red Jeep Cherokee, not a Blazer. A check of vehicle records showed the car registered to Rafael Estrada. The informant then directed Agent Buechner to Rafael's residence at 2417 Pearl Street, which was located a short distance from the bar. The informant also told the agent he had been in the Pearl Street residence the day before and had seen a kilogram of cocaine and obtained a small quantity.
 
 
 6
 Although Buechner never before had used this informant, he had previous personal knowledge that drugs were regularly sold from the Carnival Bar and that a person known as Rafael was said to be selling drugs at that location.
 
 
 7
 Buechner asked the informant to try to make a cocaine purchase from Rafael, and the informant agreed. The informant was given a pager and was instructed that, if Rafael was willing to make the sale but had to go to Pearl Street to get the cocaine, the informant was to enter "1, 1, 1" into the pager.
 
 
 8
 Agents surveilled the informant's entry into the bar and saw him emerge with Rafael shortly thereafter. The informant and Rafael talked on the sidewalk a few minutes, and then Rafael left, entered the red Jeep Cherokee, and drove away. The informant immediately entered the "1, 1, 1" code into the pager upon Rafael's departure.
 
 
 9
 Agents followed the defendant to the Pearl Street residence, where he remained for approximately 30 minutes. During this time, the decision was made to stop the defendant if he left the residence and headed back toward the bar. Since the Border Patrol agents were driving unmarked cars, they requested the assistance of the Michigan State Police. When the defendant arrived at the intersection where the State Police were waiting, they stopped him.[2] Estrada was patted down and six grams of cocaine were found in his sock.[3] Estrada was then taken to the nearest State Police post where, after receiving Miranda warnings, he gave a statement concerning his possession of the cocaine.
 
 II.
 
 10
 Estrada argues there was neither probable cause nor reasonable suspicion to support his stop and subsequent search. He bottoms this argument on two premises. First, the informant's reliability had not been previously established, and, second, the agents really had no way of knowing what went on in the bar so they had no grounds to suspect he was going home to secure cocaine. We find both of these contentions unpersuasive.
 
 
 11
 There is no rule that an informant's first tip cannot be acted upon if the information conveyed is otherwise corroborated. Here, we were not dealing with an anonymous tipster but, rather, an informant who was an alien dealing with a Border Patrol officer. The informant had no reason to lie and every reason to be truthful.
 
 
 12
 Additionally, the information provided by the informant was corroborated in substantial part both by field investigations and Agent Buechner's prior knowledge. The staged purchase of drugs by the informant also triggered the actions by the defendant that the informant previously had described as Estrada's modus operandi.
 
 
 13
 Although we need only find reasonable suspicion to justify the stop and search made here, we believe the information in the possession of the agents would have provided probable cause for arrest. In any event, when the initial stop and search revealed the cocaine in the sock, where the informant said it would be, the arrest that followed was clearly proper.
 
 III.
 
 14
 Before discussing Estrada's contentions as they relate to the search of his dwelling, we need to further flesh out the events that occurred contemporaneously with Estrada's stop and arrest.
 
 
 15
 As the officers were arresting Estrada, they saw a black Fiero with tinted windows drive by. The agents noticed the car, as they were certain they had stopped the same vehicle earlier because of suspected drug activity.[4] The Fiero travelled about 30 yards past the arrest site, made a quick u-turn, and then headed back in the direction of the Pearl Street residence.
 
 
 16
 Since the agents were now planning to secure a search warrant for Pearl Street, they became concerned that possible confederates of Estrada might be heading back to Pearl Street and evidence would be secreted or destroyed. Border Patrol Agent Bungary was sent to the Pearl Street address.
 
 
 17
 Shortly thereafter, Buechner received a page from his dispatch and was told that Agent Bungary had observed several persons trying to break into the Pearl Street residence. Agent Buechner and another agent left immediately to go to Pearl Street. While en route, Buechner received additional details from Bungary. He was told that five or six people were at the house and some had gone around the back. Bungary was unsure whether anyone had gained entry because he had gotten out of his car, and this caused some or all of the suspects to run away.
 
 
 18
 When Buechner arrived, the decision was made to enter forcibly through the front door and secure the premises.[5] Once inside, the three agents determined no one else was present. Buechner then left to seek a search warrant and the other two agents stayed behind to secure the residence.
 
 
 19
 Approximately five minutes after Buechner left, Sara Eggars and her 14-year-old daughter arrived. The Eggarses lived at the Pearl Street dwelling. The agents calmly, and without incident, identified themselves to the surprised Ms. Eggars and explained why they were there, including telling her about Estrada's arrest.[6] The agents also told her about the people who apparently had tried to gain access to the house. The agents asked for and received permission to search the house after telling Eggars she did not have to consent. Eggars and her daughter accompanied the agents during the search. The only relevant items turned up in the search were a scale, which was found in the basement; some documents; and items of men's clothing, indicating that Estrada also resided in the house. The next day, the agents returned with a trained, narcotics-sniffing dog, but Eggars denied entry to the agents.
 
 
 20
 At the suppression hearing, defendant argued that the warrantless entry into the house was illegal, the consent to search was coerced, and, even if the consent to search was voluntary, it was tainted by the initial illegal entry.
 
 
 21
 Although logically it is the last link in the chain of analysis, we dispose of the consent issue first, because it is the easiest to resolve.
 
 
 22
 No one testified at the suppression hearing but the agents, so the only view of what occurred came to the trial judge from this source. Although defendant argues that Eggars, having arrived home and finding her front door broken open and strangers in her house, was in no condition to give a voluntary consent, this conclusion is not supported by the record. The agents freely admitted that Eggars was upset at first, but calmed down after the agents gave her a full explanation of what had transpired. The agents' credibility is further buttressed by the fact that they expected Buechner back shortly with a search warrant, so there was no need to browbeat Eggars into a consent search. Also, if Eggars' version of what occurred differs from that of the agents, no explanation is offered for why she did not testify to her version at the suppression hearing. She was not indicted as a result of these events. We find no error in the trial judge's conclusion that the consent was voluntary and was not the product of coercion or other improper influences.
 
 
 23
 The initial warrantless entry into the house is more problematic. If a warrantless entry is to be condoned on these facts, it can be condoned only on the basis of exigent circumstances. The district judge found such circumstances to exist. We review "de novo the District Court's legal conclusions with respect to the issue of exigency; however, the court's factual findings on the existence of exigent circumstances will be disturbed only if they are clearly erroneous." United States v. Johnson, 9 F.3d 506, 508 (6th Cir.1993).
 
 
 24
 Exigent circumstances justifying a warrantless entry exist when there is a reasonably perceived need to prevent evidence from being lost or destroyed. United States v. Morgan, 743 F.2d 1158 (6th Cir.1984), cert. denied, 471 U.S. 1061 (1985).
 
 
 25
 Exigent circumstance analysis usually will be very fact specific, and this case is no exception. The only reason Agent Bungary was sent to the Pearl Street address was because the black Fiero turned around and appeared to head back to Pearl Street. Immediately after Bungary got back to Pearl Street, he observed one-half dozen or more persons walking around the house appearing to try to gain entry, and he actually saw some of them trying to kick in the door. (App. 127). Although Bungary saw some of the individuals present run away when he got out of his car, he could not account for the whereabouts of several others:
 
 
 26
 Q I think my question was, do you know when you went in the house, whether or not anybody was in there?
 
 
 27
 A No, we did not know.
 
 
 28
 Q You were unaware whether any individuals you had observed had, in fact, gain access?
 
 
 29
 A I did not know that for sure, that's what I suspected they may have.
 
 
 30
 Q Were you able to go in the backyard?
 
 
 31
 A No, ma'am.
 
 
 32
 Q Why not?
 
 
 33
 A Because there were some dogs back there.
 
 
 34
 Q Do you know what kind of dogs?
 
 
 35
 A No, ma'am.
 
 
 36
 Q Were they vicious dogs?
 
 
 37
 A Guard attack dogs.
 
 
 38
 Q Attack dogs?
 
 
 39
 A Yeah.
 
 
 40
 (App. 119-20).
 
 
 41
 Defendants make much of the fact that the agents saw no broken windows or other signs of a forced entry. Although this is true, it is also true that the agents did not know if one or more of the individuals had the ability to effect an entry without using force. Agent Bungary also could reasonably conclude that it was important to the suspects to get into the house, since they observed him sitting in front of the house and yet still tried to gain entry.
 
 
 42
 It is also significant that no evidence of any consequence was obtained as a result of the warrantless entry, and the agents "did no more than secure the premises to ensure the protection of everyone on the scene and to prevent the loss or destruction of ... property."
 
 
 43
 Johnson, 9 F.3d at 510.
 
 
 44
 Finally, we note that exigent circumstances were not used here to effect a search that could not have been accomplished by way of a search warrant. The agents intended to secure forthwith a search warrant and clearly had the requisite probable cause to do so. In fact, the minimal evidence uncovered would have been found pursuant to a search warrant had not Agent Buechner received the message to cancel because consent was obtained.
 
 
 45
 The initial determination of exigent circumstances must be made quickly by the agents in the field. Although in hindsight one could often say, "As it turned out they could have waited," at the time they made the decision, they did not know what they would find inside.
 
 
 46
 AFFIRMED.
 
 
 
 [1]
 Since there was no trial, we, in effect, conclude that, had the district court granted the suppression motion relative to the items seized at the residence, defendant still would have entered a guilty plea, since it was the evidence found in connection with the vehicle stop that provided the proof of the offense charged
 
 
 [2]
 Although there was an outstanding misdemeanor warrant on Estrada and he was observed running a red light just prior to being stopped, the government does not argue he was stopped for either of these reasons. Thus, we are not faced with the issue we recently resolved en banc in United States v. Ferguson, 8 F.3d 385 (6th Cir.1993)
 
 
 [3]
 After he was arrested, defendant was observed trying to hide a small bag of cocaine behind the seat of the patrol car
 
 
 [4]
 In fact, the informant was in the vehicle when it was stopped earlier, and, although no narcotics were found, it is this stop that provided the initial contact between the informant and Agent Buechner
 
 
 [5]
 Dogs were chained in the backyard, which deterred the officers from attempting to enter from the rear
 
 
 [6]
 Sara Eggars spoke Spanish and English, as did the daughter. However, Sara understood Spanish better, and so the agents talked to her in Spanish and also talked to the daughter in English. The daughter then repeated to her mother in Spanish what the agents had said