**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**William Samuel STEPHENS,
Defendant–Appellant.**

**No. 00–3924.**

United States Court of Appeals,
Sixth Circuit.

Aug. 30, 2001.

Before MOORE and COLE, Circuit Judges; FORESTER, District Judge.*

FORESTER, District Judge.

William Samuel Stephens was indicted on November 10, 1998, with knowingly and intentionally possessing and possessing with the intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1). Stephens filed a motion to suppress the evidence obtained during a search of his residence, which the district court denied. He subsequently entered a conditional plea of guilty, reserving his right to appeal the district court's denial of his motion to suppress, and the district court sentenced him to 78 months, including a fine of $3,000 and 5 years of supervised release. For the reasons stated below, we AFFIRM the district court's denial of the motion to suppress.

I.

In late 1998, Stephens lived with his girlfriend, Traci Wallace, at 5380 Powell Road in Huber Heights, Ohio (the "Residence"). The Residence was equipped with a security alarm which was monitored by Brinks Security ("Brinks"). At approximately 8:00 p.m. on October 8, 1998, Brinks notified the Huber Heights Police Department of a residential burglary alarm with motion detected in the living room area at the Residence. Officer Ron-

---

* The Honorable Karl S. Forester, Chief Judge of the United States District Court for the   Eastern District of Kentucky, sitting by designation.

ald Settich was dispatched and arrived at approximately 8:07 p.m.

Officer Settich noticed that the security lights and a front porch light were on. He also noticed a car parked in front of the Residence. He touched the hood, felt that it was warm, and concluded that it had not been parked there long. He then asked the dispatcher to run a check of the vehicle and was advised that the registered owner "came back to" the Residence (i.e., the Residence was listed on the vehicle registration as the vehicle owner's address). The dispatcher also advised Officer Settich that the owner of the vehicle was named William Stephens and provided a physical description (born in 1970, height of 5'10", and weight of 185 pounds). According to the government, Officer Settich then asked the dispatcher to "public service" the Residence—i.e., to try to contact someone at the Residence by telephone.[1]

While the dispatcher was attempting telephone contact, Officer Settich approached the Residence to search for signs of a forced entry. During his perimeter search, he looked into the residence through a picture window located to the right of the front door. Officer Settich had to climb over some bushes in order to position himself where he could see into the window, which was covered with vertical blinds. The blinds were drawn, but the government asserts that there was a quarter-inch opening or crack in the blinds, which were therefore partially open "where you could see through." Stephens asserts that the blinds were drawn and the only way someone could see into the window would be to lean or tilt their head toward the right, get up right next to the window, and then look at an angle through the opening. In other words, a person standing straight in front of the window and looking straight into the window from a public vantage point could not have seen into the Residence.

During this first look, Officer Settich could see portions of the living and dining rooms, but did not see anyone in the Residence. He continued his perimeter search to the left of the front door, encountered a fence, then backtracked, looking into the picture window a second time. Again, he did not observe any activity. He then continued checking all of the other doors and windows for signs of forced entry, but found none. After his perimeter search, he returned to the picture window and looked in a third time. This time, he saw the Stephens, an African–American male who was approximately 5'10" tall and weighed approximately 200 pounds, who appeared to be going through mail near the kitchen table.

At this point, another officer arrived, Sergeant Mark Hilton. Officer Settich told Sergeant Hilton that he saw someone in the Residence. Hilton said "Let me take a look," and looked into the window. Hilton saw Stephens pull out what he believed was a white brick from a baggie, break it in half, put half on a scale, and then break off a small piece and raise it to his nose or mouth. Settich then looked into the Residence again and saw a clear plastic bag containing a white powdery substance and what appeared to be a measuring device on the dining room table.

During the officers' perimeter search and observations into the picture window, dispatch had been attempting to contact someone in the Residence by telephone. The dispatcher contacted Brinks to obtain the name and telephone number of the person who had contracted with Brinks for the security service, and eventually learned that it was Traci Wallace. The

---

1. There appears to be a dispute over the timing of this request.

dispatcher called the Residence several times, but no one answered.

After observing Stephens in the Residence, the officers contacted dispatch to determine whether the "public service" attempt was successful, but learned that no one in the Residence had answered the telephone.[2] The officers testified that they could hear the phone ringing as they stood outside the residence. They then rang the doorbell several times, but no one answered.

The officers looked into the picture window again, but did not see anyone and did not see any of the items (baggie, white powdery substance, scales) they had seen before. At this point, they stepped away from the house to wait and to observe it from a distance. Meanwhile, unbeknownst to the officers, Brinks had called the dispatcher to cancel the alarm, as Brinks had apparently spoken with Ms. Wallace and learned that Stephens was authorized to be in the Residence. The dispatcher then asked Brinks for Ms. Wallace's work telephone number. While on the telephone with Ms. Wallace, Ms. Wallace spoke with Stephens on another line and told him to answer the telephone. The dispatcher then called the Residence again, spoke with Stephens, and asked him to go outside to speak with the officers.

While all of this transpired, two detectives arrived at the Residence at approximately 8:45 p.m. Almost immediately thereafter, dispatch advised the officers that Stephens would be meeting them at the front door, but did not relay to them the circumstances involved. Stephens came out of the house, was patted down for weapons, and then asked for identification. He produced his Ohio driver's license, which listed the Residence as his address. When asked, he told the officers that no one else was in the house and that he simply had not wanted to answer the telephone or the doorbell.

The officers asked if they could go into the Residence to see if anyone else was in there, but Stephens refused to grant them entry. The officers escorted him to a police cruiser, placed him in the back seat, and, according to the government, advised him of their intention to secure the house until a search warrant could be obtained. Stephens states that the police officers told him that they were going to go into the Residence to make sure that no one else was in there. Three of the officers then conducted a warrantless sweep of the Residence, during which they observed marijuana in plain view on the night stand and on the dining room table.

One of the detectives then left the scene to obtain a search warrant. According to the government, it was only at this time that the officers learned that Stephens had been in the Residence with permission and, therefore, the alarm should be disregarded.[3] The affidavit supporting the application for the search warrant included the observations through the picture window of the Residence, and also the officers' observation of marijuana during the warrantless sweep. The search of the Resi-

---

**2.** According to the Stephens's brief, Officer Settich did not ask dispatch to "public service" the residence until *after* he had observed the appellant inside the Residence. Therefore, there appears to be a factual dispute as to when the officers asked dispatch to "public service" the Residence. The district court's opinion suggests that the officers did not request a "public service" of the residence until after they observed the defendant inside the Residence.

**3.** Regardless of when the officers requested the "public service" calls, there apparently is no dispute that at the time the officers looked into the window and saw Stephens, they did not know whether he was in the Residence with permission.

dence ultimately produced nine (9) kilos of cocaine, as well as some firearms.

Stephens moved to suppress the evidence obtained during the search. The district court denied the motion, holding primarily that exigent circumstances provided justification for the officers' actions in looking into the picture window, despite the vertical blinds being closed, because they had probable cause to believe that there was a burglary in progress at the Residence. Stephens challenges this ruling on appeal.

## II.

Upon review of the denial of a motion to suppress evidence, this court reviews the district court's findings of fact for clear error and its conclusions of law de novo. *United States v. Lumpkin,* 159 F.3d 983, 986 (6th Cir.1998). In this Circuit, the district court's conclusion that exigent circumstances existed is a finding of fact. *United States v. Pollard,* 215 F.3d 643, 648 (6th Cir.2000) (noting that a district court's factual determination that exigent circumstances existed is reviewed for clear error).

On review, we conclude that the district court did not err in finding that exigent circumstances existed. Pursuant to this exception, "police [may] enter a residence without a warrant if there is probable cause to believe that there is a burglary in progress." *United States v. Reed,* 141 F.3d 644, 649 (6th Cir.1998) (citing *United States v. Johnson,* 9 F.3d 506, 509–10 (6th Cir.1993)). As noted by a separate panel of this court, this exception is "circumscribed, however, by the object of the search—here, to find a suspected intruder." *Id.* Further, "exigent circumstances justify a warrantless entry into a residence only where there is also probable cause to enter the residence." *Johnson,* 9 F.3d at 509. " 'The establishment of probable

cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." ' " *Id.* (quoting *United States v. Ogbuh,* 982 F.2d 1000, 1002 (6th Cir.1993)). These principles, while generally applied to the warrantless entry of a residence, apply with equal force to the officers' less-intrusive actions of looking into the picture window.

In the present action, Stephens argues that there were no exigent circumstances present at the time the officers observed him in the Residence. The officers were investigating a possible burglary, but had already determined by a perimeter search that there were no signs of forced entry or foul play. Officer Settich had looked into the Residence at least three times and had seen no signs of a burglary. There was a car in front of the house with a warm hood, indicating it had been recently driven, and the officers knew that the owner lived at the Residence. The description of the owner of the vehicle parked in front of the house matched the person that Officer Settich saw in the Residence going through the mail. At this point, according to Stephens, any exigent circumstances that may have previously existed ceased to exist. He further argues that the officers had no reason to believe that anything illegal was occurring. Thus, there were no exigent circumstances and no probable cause for the officers to look into the Residence any further and the additional observations were an unconstitutional search.

Based on the facts presented, the district court was not clearly erroneous in determining that exigent circumstances existed when the officers made their observations through the picture window. Although the officers had not seen signs of forced entry, they had not yet received confirmation that the man they had seen in the house was authorized to be there. They observed Stephens going through the

mail, but without confirmation that he was authorized to be there, his presence was not so benign as he suggests. Even if the officers believed that the man they saw in the Residence *was* authorized to be there, they had no assurance that someone else wasn't still in the house unbeknownst to Stephens. Thus, the possibility still existed that there was a burglary in progress.

The best that Stephens has shown is that the exigent circumstances *may have* dissipated prior to the time the officers looked in the window and saw him with cocaine. However, this was *at best* a close call by the officers, and under these circumstances, the facts are not so one-sided as to say the district court committed clear error in its finding.

### III.

Given the court's conclusion regarding exigent circumstances, it is not necessary to consider Stephens's remaining arguments. Accordingly, we AFFIRM the district court's denial of the motion to suppress.