KELLY, Judge,
Concurring in part, dissenting in part.
I cannot join the majority in affirming P.B.P.’s conviction for battery on a law enforcement officer because the State failed to prove an essential element of that offense — that Officer Bruce was engaged in the lawful performance of his legal duty when the battery occurred.[2] The trial court applied the wrong legal standard for *627 determining the lawfulness of the officers’ actions, and the majority follows suit by approving Officer Bruce’s warrantless entry concluding it was “reasonable” but never finding that it was supported by exigent circumstances, the necessary prerequisite to a conclusion that the entry was reasonable under the Fourth Amendment.
In Tillman v. State, 934 So.2d 1263, 1271 (Fla.2006), the supreme court explained that in evaluating the sufficiency of the evidence to reach the jury on the element of “lawful execution,” “courts must apply the legal standards governing the duty undertaken by the law enforcement officer at the point that an assault, battery, or act of violent resistance occurs.” Because the battery on Officer Bruce occurred during a warrantless entry into the backyard of P.B.P.’s home, the sufficiency of the evidence on the lawful execution element of battery on a law enforcement officer must be evaluated by applying Fourth Amendment law governing warrantless entry by police into a home.[3] See id.
Under the Fourth Amendment, searches and seizures inside a home without a warrant are presumptively unreasonable. Brigham City v. Stuart, — U.S.-, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006). Because, however, “the ultimate touchstone” of the Fourth Amendment is reasonableness, the warrant requirement is subject to certain exceptions. Id. at 1947. The warrant requirement will give way when the “ ‘exigencies of the situation’ make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.” Id. (quoting Mincey v. Arizona, 437 U.S. 385, 393-94, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)).
“The circumstances in which the Supreme Court has applied the exigent circumstances exception are ‘few in number and carefully delineated.’ ” Riggs v. State, 918 So.2d 274, 279 (Fla.2005) (quoting United States v. U.S. District Court, 407 U.S. 297, 318, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972)). The Court has held that law enforcement officers may make a warrant-less entry onto private property to fight a fire and investigate its cause, to pursue a fleeing felon, to prevent the destruction of evidence, or “to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.” Brigham City, 126 S.Ct. at 1947; see also Riggs, 918 So.2d at 279 (cataloging the circumstances in which the Supreme Court has applied the exigent circumstances exception).
The trial court appears to have concluded that the officers’ intrusion was lawful because they were investigating an anonymous complaint regarding juveniles running through backyards in the neighborhood, they performed that investigation reasonably, and while doing so they encountered circumstances that “caused them to have a very reasonable suspicion and to be cautious and to go about their lawful performance of duties.” The State apparently recognizes that this reasoning does not justify the officers’ warrantless entry,[4] because on appeal the State argues *628 for the first time that the entry was justified by exigent circumstances; specifically, that “the officers had at least reasonable suspicion, if not probable cause, to believe that a burglary was being committed in [P.B.P.’s] residence.... Under these circumstances, it was reasonable for an officer to enter and remain in the backyard until [P.B.P.’s] identity could be determined.”
Although the Supreme Court has not addressed the issue, federal circuit courts that have considered the question have upheld warrantless searches conducted during burglary investigations under the rubric of exigent circumstances. See United States v. Johnson, 9 F.3d 506, 509 (6th Cir.1993). Those courts have unanimously concluded that an officer may lawfully enter a residence without a warrant under the exigent circumstances exception when the officer reasonably believes a burglary is in progress. See United States v. McCullough, 457 F.3d 1150, 1164 (10th Cir.2006). Florida’s courts have reached the same conclusion. See, e.g., Zakrzewski v. State, 866 So.2d 688 (Fla.2003); Davis v. State, 834 So.2d 322 (Fla. 5th DCA 2003); State v. Mann, 440 So.2d 406, 408 (Fla. 4th DCA 1983).
The argument that the officers’ entry was justified as part of a burglary investigation is flawed in several respects, not the least of which is that it overlooks the fact that the officers’ initial entry into a constitutionally protected area had nothing to do with a suspected burglary of P.B.P.’s home. Initially, the officers entered the backyard of a home two houses north of P.B.P.’s home. They did so after being dispatched to that address to investigate a complaint of juveniles running through backyards. The officers did not happen upon the “suspicious circumstances” until after they entered the backyard of that house and began a house-to-house backyard search eventually reaching P.B.P.’s yard. However, the determination of whether a warrantless entry was lawful is based on what the officers knew at the time of entry. See Seibert v. State, 923 So.2d 460 (Fla.2006).
At the time of entry, the officers had no information beyond the fact that someone had called to report juveniles running through backyards. They were not investigating a possible burglary. The majority opinion’s citation to A.E.R., Duda, and J.B. suggests that the majority has concluded that the initial entry to investigate this complaint was an emergency that not only required an immediate entry into the backyard of the home where the call originated, but a house-to-house search of the neighbors’ backyards as well. The distinction between the facts in this case and the facts in the eases cited by the majority is self-evident.
In A.E.R., the officers were investigating a “neighborhood complaint” that juveniles had been “pool hopping.” 464 So.2d at 152. The officers did not arrive and start searching backyards to locate the offending juveniles. They went to the home where the complaint originated and spoke to the complaining party who pointed to A.E.R.’s house as the one where the juveniles lived. It was not until after the officers approached the front of that house *629 and saw the juveniles’ apparent attempt to flee out the back door that the officers ran to the back. As they did so, one officer observed a juvenile carrying a marijuana plant that the officers later confiscated.
A.E.R. sought to have the plant suppressed arguing the officer had no right to be in the side yard, and thus the seizure of the plant could not be sustained under the plain view doctrine. Id. This court framed the issue as whether “pursuant to a neighborhood trespassing complaint, officers, without a warrant, may lawfully enter the side yard of appellant’s home in an effort to question suspected misdemeanants when the officers believe, after observing the suspects inside the home, that they are eluding the officers.” Id. at 153. We first acknowledged the principle that officers investigating a neighborhood complaint may investigate by knocking on an individual’s front door, where the individual has no expectation of privacy. This court then concluded that the juveniles’ apparent attempt to flee out the back door, which the officers witnessed from the front of the house, created exigent circumstances requiring “immediate action” on the part of the officers. Id. at 154.
In Duda, the officers were responding to a call regarding a domestic disturbance or a possible fight at a residence. 437 So.2d at 794. When they arrived they heard shouting coming from the rear of the home and the backyard. Recognizing that the police have a right to enter and investigate when they reasonably believe they are confronted with an emergency situation, this court specifically found that the officers were faced with a “potential emergency situation” and thus were justified in going immediately to where they believed the disturbance was taking place. Id. at 796.
In In re J.B., the officers were responding to a home that was the source of a 911 call. 621 So.2d at 489. When the call came in, the caller hung up without speaking or requesting assistance. The system dispatched an officer to the home to investigate the call. In finding that the officers acted lawfully in trying to enter the home, the court analogized a 911 call to “screams for help.” Id. at 491. The court also discussed the fact that the 911 system is used to report crimes and injuries requiring immediate assistance and that “a disconnect” could happen for “a myriad” of reasons and did not mean the emergency was over. Given that a 911 call is “a cry to the authorities for help,” the court concluded that an investigating officer has a duty to investigate until he is satisfied no emergency exists. Id.
Although the cases cited by the majority are clearly distinguishable, even assuming arguendo that the officers’ initial entry to investigate the disturbance was justified, the officers were not entitled to remain behind the homes once they determined that no one was back there because any search conducted under the auspices of exigent circumstances must be “strictly circumscribed by the exigencies which justify its initiation.” Mincey, 437 U.S. at 393, 98 S.Ct. 2408 (quoting Terry v. Ohio, 392 U.S. 1, 25-26, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)); see also Riggs v. State, 918 So.2d 274, 279 (Fla.2005) (explaining that when a warrantless search is based on exigent circumstances, an officer must cease the search once he determines that no emergency exists). In other words, once the officers realized that no one was running through backyards, they no longer had a reason to remain behind the houses, much less conduct a yard-to-yard search.
The reasonableness of this course of conduct — leaving after determining that no one was behind the homes — is evidenced by the actions of Officer Larose. Officer Larose testified that he first went into the *630 backyard of a home across the street from P.B.P.’s home because he thought he heard voices coming from that area. Using his flashlight, he was able to see several backyards from his initial vantage point. Seeing no one behind those houses, he walked back out to the street. In contrast, neither Officer Perrone nor Officer Bruce offered any justification for their decision to remain behind the homes on P.B.P.’s side of the street although, like Officer Larose, they saw no one behind the homes. Thus, even if they were justified in going immediately into the backyard of the home where the complaint originated, their continued presence behind the homes was unauthorized, and the “suspicious circumstances” they observed as they approached or entered P.B.P.’s yard cannot provide an after-the-fact justification for their actions up to that point. See, e.g., Olivera v. State, 315 So.2d 487 (Fla. 2d DCA 1975) (explaining that observations made by an officer from a location where he had no right to be are tainted and cannot be used to support the State’s position that the officer had probable cause to search or arrest); cf. Davis, 834 So.2d at 327 (explaining that any search conducted after the exigency no longer exists is illegal and any contraband observed pursuant to the illegal search is inadmissible).
Even taking the “suspicious circumstances” into account, to justify a warrant-less entry based on the belief that a burglary is in progress, the police must have probable cause to believe that a burglary is occurring, not simply a mere suspicion. See, e.g., McCullough, 457 F.3d at 1164; United States v. Brown, 449 F.3d 741, 748 (6th Cir.2006); United States v. McClain, 444 F.3d 556 (6th Cir.2005); United States v. Johnson, 9 F.3d at 509; Guin v. City of Riviera Beach, 388 So.2d 604, 606 (Fla. 4th DCA 1980). In this context,
[pjrobable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion. Under this “flexible, common-sense standard,” the establishment of probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. However, the “mere possibility” that a crime could be occurring within a home is not sufficient to justify a warrantless search; the police must have an objectively reasonable basis for their belief that a crime is being committed. Likewise, mere speculation that a crime could be occurring is insufficient to establish probable cause.
McClain, 444 F.3d at 562-63 (citations and some internal quotation marks omitted). The trial court made no determination that the officers had probable cause to believe that a burglary was in progress. While the majority alludes to the possibility of a burglary, it stops short of saying that the officers had probable cause to believe a burglary was in progress.
Nor would the record support that conclusion. The record shows that the officers were not responding to a reported burglary and that no alarm had been reported. They did not see any signs of forced entry such as a broken window or a door with pry marks — only a screen propped up next to a second floor window. They did not see any open doors, and when they knocked on the front door, the occupant answered the door and agreed to produce identification. While the trial court notes that the officers saw someone peering out a rear window and that someone tried to hide when the officers shined a light in through a rear window of the home, this hardly seems unusual considering it was three o’clock in the morning and the occupants had no idea the police were roaming through their backyard, nor any indication that police flashlights were the source of the light being shone into the *631 house. In light of all these circumstances, I cannot conclude that the officers had anything more than a mere suspicion that a crime could be occurring. Compare McCullough, 457 F.3d at 1164 (noting that the security alarm at the residence had been triggered, the people at the residence were dirty, did not have any identification, were admittedly not the homeowners, did not know the name of the homeowners, were acting in a nervous manner, and one of them, who was observed leaving the residence, did not attempt to speak to the officer and appeared disoriented); Brown, 449 F.3d at 746 (noting that the officer had responded to a burglar alarm that had been triggered twice in a short period of time, he had gotten no response from inside the house, there was no car in the driveway, and the front door was secure but the back door, which had triggered the alarm, was ajar); Johnson, 9 F.3d at 507 (noting that the officers were responding to a call from a neighbor reporting a burglary in progress, that the neighbor reported seeing individuals crawl through a broken window in the home, that the door to the home was locked but a woman and a man were in the house, the man and the woman claimed to live there but could not open the door because they did not have a key, and they had no identification).
Moreover, even if the officers’ observations justified having Officer Bruce remain behind the houses to watch the back door while Officer Perrone went to P.B.P.’s front door, they certainly did not justify the actions Officer Bruce took when P.B.P. appeared at the back door. Officer Bruce testified that when P.B.P. opened the rear sliding glass door and saw him, P.B.P. told him to leave the property. Rather than simply maintaining his position, which the majority suggests may have been outside P.B.P.’s yard, Officer Bruce testified that he entered the yard, walked across the patio area and “went up to him, approached him, was at a bladed stance, he was standing inside of the door, sliding glass doors.” Officer Bruce repeatedly asked P.B.P. for identification, but P.B.P. refused to provide it at the back door. Instead, he told Officer Bruce to leave and meet him at the front door where the other officer was awaiting his return. When Officer Bruce refused to leave, P.B.P. pushed him.
Officer Bruce acknowledged that when he entered P.B.P.’s property and came into contact with P.B.P., he did not have permission to be on the property and he had not seen anything illegal occurring on the property. Although he did not explain why he had stayed behind when Officer Perrone went to the front door, he presumably did so to ensure that no one left through the back door of P.B.P.’s home. To accomplish this task, Officer Bruce did not need to come onto P.B.P.’s patio and stand three feet away from him. He could have remained where he had been standing when he first joined Officer Perrone behind the house. This would have placed him outside of P.B.P.’s backyard but still close enough to observe the back of the house. Because Officer Bruce entered a constitutionally protected area without a warrant and without exigent circumstances his entry was not “reasonable” under the Fourth Amendment. When the battery occurred he was not engaged in the “lawful performance” of his duties because his entry violated the Fourth Amendment. Accordingly, P.B.P. was entitled to a judgment of dismissal on the charge of battery on a law enforcement officer.
The charges of obstructing or opposing an officer with violence and without violence stem from what happened next, and as was the case with the battery, we must determine the lawfulness of the officers’ actions when these offenses occurred. See Tillman, 934 So.2d at 1273. Officer Per- *632 rone, who had been waiting at the front door and had been joined by Officer La-rose, heard shouting and Officer Bruce loudly yelling commands. Officer Bruce testified that he used a “command voice” to tell P.B.P. not to touch him and that it was battery on a law enforcement officer. When Officer Perrone went to the back of the house he saw P.B.P. “very close to Officer Bruce’s face, screaming at him verbally, that he wasn’t getting him shit and told him to get the fuck off his property.” Officer Perrone did not see P.B.P. strike Officer Bruce, nor did he see P.B.P. “do anything illegal” up to the point that Officer Perrone approached P.B.P., “put hands on him” and “put him in an escort position” to “pull him out of the house.” At that point P.B.P. began to kick, throw punches, and push until he “broke loose” and ran away, ignoring commands to stop.
When Officer Perrone heard Officer Bruce shouting, P.B.P. had gone into the house and closed the door. Thus, Officer Perrone had no way to know where P.B.P. was at that moment. That uncertainty paired with hearing Officer Bruce loudly commanding someone not to touch him and stating that it was battery on a law enforcement officer was enough to make it reasonable for Officer Perrone to enter the backyard to ascertain whether Officer Bruce was in need of his assistance. See Brigham City, 126 S.Ct. at 1947 (“Law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.”). At this point, Officer Perrone was acting lawfully when he entered the backyard to investigate.
Thus, the question becomes whether Officer Perrone was acting lawfully when he grabbed P.B.P. and pulled him out of the house. Section 901.151(2), Florida Statutes (2004), which governs detentions, provides:
Whenever any law enforcement officer of this state encounters any person under circumstances which reasonably indicate that such person has committed, is committing, or is about to commit a violation of the criminal laws of this state or the criminal ordinances of any municipality or county, the officer may temporarily detain such person for the purpose of ascertaining the identity of the person temporarily detained and the circumstances surrounding the person’s presence abroad which led the officer to believe that the person had committed, was committing, or was about to commit a criminal offense.
This statute is consistent with the holding in Terry, 392 U.S. at 21, 88 S.Ct. 1868, which requires “specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.” Given what he had heard and witnessed, it was reasonable for Officer Perrone to conclude that P.B.P. had, or was about to commit a felony, battery on a law enforcement officer. Accordingly, he was acting lawfully when he detained P.B.P. Because it was this lawful action by Officer Perrone that precipitated the events leading to the charges of obstructing or opposing an officer with and without violence, I concur with the majority that P.B.P. was not entitled to a judgment of dismissal on those charges.

. P.B.P. has argued that he was entitled to a judgment of dismissal as to each offense with which he was charged because the State failed to prove that the officers were engaged "in the lawful performance” of their duties, or "in the lawful execution of any legal duty” at the time the offenses occurred. See §§ 784.07, 843.01, 843.02, Fla. Stat. (2003). The supreme court has stated that although worded in a somewhat different way, these elements are "functionally identical.” Tillman v. State, 934 So.2d 1263, 1266 n. 2 (Fla.2006).

. As the majority correctly acknowledges, the zone of protection under the Fourth Amendment extends to the curtilage of a home, including the backyard. See State v. Rickard, 420 So.2d 303, 306 (Fla.1982) (noting that courts will not allow a warrantless search or seizure in a constitutionally protected area such as one's backyard); Glass v. State, 736 So.2d 788 (Fla. 2d DCA 1999) (stating that officers were not justified in entering a backyard of a residence without consent, a warrant, or exigent circumstances).

. In fairness to the trial court, the State offered no justification for the officers’ entry when this issue was argued in the trial court. *628 In fairness to the State, it probably concluded justification was not an important issue because at that time the law in this district was such that the lawfulness of the officers' actions was immaterial except with respect to the charge of opposing an officer without violence. See Tillman, 934 So.2d at 1263 (rejecting the view held by this court and others that section 776.051(1), Florida Statutes (2003), which prohibits the use of force to resist an arrest notwithstanding the illegality of the officer’s actions, extends to other police-citizen encounters).