UNITED STATES of America,
Plaintiff–Appellee,

v.

Alan RADKA, Defendant–Appellant.

No. 89–1892.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 8, 1990.

Decided June 5, 1990.

Michael O. Lang (argued), Detroit, Mich., for U.S.

N.C. Deday LaRene (argued), Detroit, Mich., for Alan Radka.

Before MERRITT, Chief Judge; and KEITH and NORRIS, Circuit Judges.

KEITH, Circuit Judge.

Defendant Alan Radka ("Radka") appeals from the district court's May 19, 1989 order denying his motion to suppress evidence seized by federal drug enforcement agents during a warrantless search of his home. For the reasons set forth below, we REVERSE the denial of the motion to suppress.

## I.

### A.

In January 1987, Drug Enforcement Administration ("DEA") Agent James Phe- neice learned from a confidential informant that large quantities of marijuana had been delivered to a Chelsea, Michigan residence during 1984 and 1985. On the basis of this information, the DEA initiated the investigation that led to Radka's prosecution.

Following the informant's directions, DEA agents located a house on Scio Church Road. The informant, who positively identified aerial photographs of the premises taken by the DEA, told the agents that he had stacked bales of marijuana in one of the outbuildings shown in the photographs. Based on this information, the DEA agents conducted ground and aerial surveillance of the property from February through June 1987. During this period, the agents learned that Radka owned the premises.

Prior to June 23, 1987, the aerial surveillance produced no evidence of activity at the Scio Church Road dwelling. However, agents conducting ground surveillance observed, on one occasion, the brief presence of a semi-trailer and workers laying a cement floor in one of the outbuildings.

During aerial surveillance on June 23, 1987 at approximately 3:45 p.m., DEA Agent Hawthorne Lee observed a pick-up truck and a burgundy vehicle at the Scio Church Road residence. Agent Lee notified his fellow agents. Shortly thereafter, he observed a silver vehicle arrive and depart from the property. Agent Lee observed the pick-up truck pulling away from the outbuildings at approximately 6:20 p.m. He testified that he lost sight of the pick-up truck, and the burgundy vehicle that he observed at 3:45 p.m. had departed. Transcript of Suppression Hearing on March 31, 1989 (hereinafter Transcript) at 34–37, *United States v. Radka*, No. 88–80865 (E.D.Mich. May 19, 1989). Because of dwindling fuel and the onset of darkness, Agent Lee terminated the aerial surveillance at approximately 9:00 p.m. Shortly before 9:00 p.m., he observed a dark blue vehicle enter the Scio Church Road property and park near the garage. At approximately 8:45 p.m., DEA Agent Donald Nelson and Detroit Police Officer McIntyre, who were in communication with the aerial

surveillance team, observed the dark blue vehicle leave the premises.

Agent Nelson and Officer McIntyre left their ground surveillance post and followed the blue car that was travelling at speeds up to 80 mph. Approximately eight to nine miles from the Scio Church Road dwelling, Agent Nelson and Officer McIntyre stopped the car under the pretext of administering a speeding citation. They reprimanded the driver, Timothy Pelkey ("Pelkey"), for driving too fast and informed him that they wished to inspect his car to "see if everything was OK." Transcript at 46. Agent Nelson initiated the pretextual traffic stop because he believed Pelkey had picked up controlled substances from the Scio Church Road dwelling. Agent Nelson hoped to discover evidence to support a search of the house. Immediately after Officer McIntyre removed the keys from the ignition and opened the trunk, Pelkey fled. Agent Nelson apprehended Pelkey 35 yards from the car and returned him to the vehicle where four boxes of individually wrapped soles of hashish had been discovered. Pelkey was arrested for possession of hashish and transported to the Washtenaw County jail by sheriff's deputies.

At approximately 10:05 p.m., Agent Nelson and Officer McIntyre returned to the Scio Church Road premises. Before returning, they instructed the ground surveillance agents to detain any vehicles leaving the location. In their absence, the agents stopped Lawrence Potalivo ("Potalivo"), who was exiting the property in a Volkswagen registered to Radka. A search of the car failed to produce any contraband. The house, surrounded by heavy trees and brush, is set back an eighth of a mile from the road where Potalivo was stopped; it is one half mile from any other residence.

Prior to his return, Agent Nelson decided to enter and secure the Scio Church Road premises. Transcript at 73. He thought the law enforcement activities were conspicuous to anyone driving on Scio Church Road. He believed that acquaintances or confederates in the suspected drug trafficking could observe the agents and alert those on the premises. Agent Nelson reasoned that information concerning the police surveillance would likely spur the flight of those involved and the destruction of evidence.

Just prior to entry, Agent Nelson asked Agent William Ripp to contact the Assistant United States Attorney involved in this case. The Assistant United States Attorney was contacted *after* the premises had been entered and secured. No attempt was made to contact a federal magistrate until midnight—approximately two hours *after* the initial entry.

Shortly after 10:00 p.m., the agents entered the property, proceeded up the driveway, and knocked on the door. Receiving no response after 45 seconds, the agents effected a forced entry. In the house, the agents discovered Radka along with two rifles and one handgun. Three soles of hashish were found in the kitchen. While searching the larger shed, agents heard a rustling noise in the smaller shed. Inside the smaller shed, the agents discovered a pick-up truck with its door open and its interior lights on. They also found a large open container holding cardboard boxes.

After securing the premises, Agent Ripp prepared the application for a telephonic search warrant. At 4:49 a.m. on June 24, 1987, Magistrate Virginia M. Morgan issued a telephonic search warrant for the Scio Church Road property. Fed.R.Crim.P. 41(c)(2).

Upon executing the search warrant, the agents discovered in the house two motor vehicles, three soles of hashish, a .25 caliber automatic handgun, a .22 caliber rifle, a 30–30 caliber rifle, and a 20 gauge shotgun. In the smaller shed, the agents found twenty-two cardboard boxes inside a metal container of hashish and a full capacity beam scale. The agents seized a total net weight of 688 kilograms of hashish during the June 24, 1987 search of the Scio Church Road dwelling.

### B.

In a two-count federal grand jury indictment filed December 21, 1988 and a superseding indictment filed March 21, 1989,

Radka was charged with: count 1, aiding and abetting Timothy Pelkey in the possession with the intent to distribute the hashish found in Pelkey's car, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2;[1] and count 2, possession with intent to distribute the hashish found on his property, in violation of 21 U.S.C. § 841(a)(1). On March 13, 1989, Radka moved to suppress the evidence challenging the propriety of the warrantless entry. On March 31, 1989, an evidentiary hearing was held on Radka's motion before the Honorable Horace W. Gilmore. On that same date, the motion to suppress was denied and an order was subsequently entered.

Radka pled guilty to count two of the superseding indictment charging him with possession with the intent to distribute over 100 kilograms of hashish. The Rule 11 plea agreement was taken subject to appellate review of the denial of Radka's motion to suppress. Fed.R.Crim.P. 11(a)(2).

On July 24, 1989, Radka was sentenced to eight years in prison and four years of supervised release.[2] He was fined $5000; and a $50 special assessment was imposed. Radka filed a timely notice of appeal on July 27, 1989.

## II.

On appeal, Radka argues that the government failed to prove the propriety of the warrantless entry onto his property which resulted in the discovery and seizure of the hashish. The government counters that exigent circumstances justified the warrantless entry into the house and outbuildings to secure the premises and prevent the destruction of evidence pending the issuance of a search warrant. We disagree with the district court's finding that there was an objectively reasonable basis for concluding that the loss or destruction of evidence was imminent. Therefore, we find that the district court erred in denying Radka's motion to suppress the evidence.

## A.

A central tenet of the fourth amendment is the requirement that searches and seizures be conducted pursuant to warrants issued, based on probable cause, by a neutral and detached magistrate. *See United States v. Martinez–Fuerte,* 428 U.S. 543, 554, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116 (1976) ("The Fourth Amendment imposes limits on search-and-seizure powers in order to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.") A warrant issued by a neutral and detached magistrate guarantees individuals freedom from capricious governmental interference. *See Johnson v. United States,* 333 U.S. 10, 13–14, 68 S.Ct. 367, 368–69, 92 L.Ed. 436 (1948) ("The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable [people] draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime."). The probable cause standard further protects against unjustified government intrusion. *Id.; Martinez–Fuerte,* 428 U.S. at 554, 96 S.Ct. at 3081.

Warrantless searches are *per se* unreasonable under the fourth amendment, except in a few carefully delineated instances.[3] *See Katz v. United States,* 389 U.S.

---

1. Radka's co-defendant, Timothy Pelkey, was charged with one count of possession with intent to distribute hashish. Co-defendant Pelkey has not been apprehended and, to this date, remains a fugitive.

2. Radka remains released on a $25,000 personal bond pending appeal.

3. The exceptions to the warrant requirement include the following: automobile searches, *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); searches pursuant to consent, *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); searches incident to lawful arrest, *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); seizures in plain view, *Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983); limited searches and seizures under the stop and frisk doctrine, *Terry v.*

347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). The exigent circumstances exception relies on the premise that the existence of an emergency situation, demanding urgent police action, may excuse the failure to procure a search warrant. *See Welsh v. Wisconsin,* 466 U.S. 740, 750, 104 S.Ct. 2091, 2097–98, 80 L.Ed.2d 732 (1984). Under exigent circumstances, a warrantless entry may be required to secure evidence that is in the process of being lost or destroyed. *See Vale v. Louisiana,* 399 U.S. 30, 35, 90 S.Ct. 1969, 1969–73, 26 L.Ed.2d 409 (1970); *Johnson v. United States,* 333 U.S. 10, 14–15, 68 S.Ct. 367, 369–70, 92 L.Ed. 436 (1948); *see also United States v. Sangineto–Miranda,* 859 F.2d 1501, 1511 (6th Cir.1988) ("exigent circumstances will be present when there is an urgent need to prevent evidence from being lost or destroyed"); *United States v. Morgan,* 743 F.2d 1158, 1161 (6th Cir.1984) ("Absent exigent circumstances, police officers may not enter an individual's home or lodging to effect a warrantless arrest or search."), *cert. denied,* 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985). Such warrantless entries and searches are "presumptively unreasonable." *See Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). Therefore, the government bears the "heavy burden" of demonstrating exigency. *Welsh,* 466 U.S. at 750, 104 S.Ct. at 2097–98; *see Morgan,* 743 F.2d at 1162.

Other circuits have acknowledged that it is characteristic of drug traffickers, when discovered, to dispose of their narcotics and to flee. *See e.g., United States v. Socey,* 846 F.2d 1439, 1445 (D.C.Cir.), *cert. denied,* 488 U.S. 858, 109 S.Ct. 152, 102 L.Ed.2d 123 (1988); *United States v. Johnson,* 802 F.2d 1459, 1462 (D.C.Cir.1986); *United States v. Rubin,* 474 F.2d 262, 268–69 (3rd Cir.), *cert. denied,* 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973). While we hesitate to take judicial notice of the "characteristics" of drug traffickers, we do concede that narcotics can be easily destroyed

while a search is progressing. *Johnson,* 802 F.2d at 1462. Targets of drug investigations, nevertheless, are entitled to the same constitutional protections as targets of any other criminal investigation. *See United States v. Karo,* 468 U.S. 705, 717, 104 S.Ct. 3296, 3304, 82 L.Ed.2d 530 (1984) ("Those suspected of drug offenses are no less entitled to [fourth amendment] protection than those suspected of nondrug offenses."). Presently, our nation is plagued with the destructive effects of the illegal importation and distribution of drugs. At this critical time, our Constitution remains a lodestar for the protections that shall endure the most pernicious affronts to our society. The warrant requirement of the fourth amendment governs zealous law enforcement. The drug crisis does not license the aggrandizement of governmental power in lieu of civil liberties. Despite the devastation wrought by drug trafficking in communities nationwide, we cannot suspend the precious rights guaranteed by the Constitution in an effort to fight the "War on Drugs." Notwithstanding the ease in which narcotics can be destroyed, a warrantless entry into the home of a suspected drug trafficker, effected without an objectively reasonable basis for concluding that the destruction of evidence is imminent, does not pass constitutional muster. *See Vale,* 399 U.S. at 34–35, 90 S.Ct. at 1971–73.

■ We will review *de novo* the district court's legal conclusions with respect to the issue of exigency. *Sangineto–Miranda,* 859 F.2d at 1512. A district court's factual findings on the existence of exigent circumstances will be disturbed only if they are clearly erroneous. *Morgan,* 743 F.2d at 1162; *United States v. Gargotto,* 510 F.2d 409, 411 (6th Cir.1974), *cert. denied,* 421 U.S. 987, 95 S.Ct. 1990, 44 L.Ed.2d 477 (1975). In reviewing the district court's finding that exigent circumstances existed at the time of the warrantless search, we will consider the totality of circumstances

*Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); searches and seizures in hot pursuit of a fleeing felon, *United States v. Santana,* 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976); and

searches and seizures to prevent the loss or destruction of evidence, *Vale v. Louisiana,* 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970).

and the "inherent necessities of the situation at the time." *Sangineto–Miranda*, 859 F.2d at 1512 (quoting *United States v. Rubin*, 474 F.2d 262, 268 (3rd Cir.), *cert. denied*, 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973)).

■ The law is well-settled that a warrantless entry will be sustained when the circumstances then extant were such as to lead a person of reasonable caution to conclude that evidence of a federal crime would probably be found on the premises and that such evidence would probably be destroyed within the time necessary to obtain a search warrant. *See, e.g., Roaden v. Kentucky*, 413 U.S. 496, 505, 93 S.Ct. 2796, 2801–02, 37 L.Ed.2d 757 (1973) (without prior judicial approval, police may enter a home only under exigent circumstances requiring a "now or never" response to preserve evidence of the crime); *United States v. Elkins*, 732 F.2d 1280, 1284 (6th Cir.1984). A warrantless entry to prevent the loss or destruction of evidence is justified, if the government demonstrates: (1) a reasonable belief that third parties are inside the dwelling; and (2) a reasonable belief that the loss or destruction of evidence is imminent. *Sangineto–Miranda*, 859 F.2d at 1512; *accord, Socey*, 846 F.2d at 1445; *United States v. Napue*, 834 F.2d 1311, 1326 (7th Cir.1987). The mere possibility of loss or destruction of evidence is insufficient justification. *United States v. Hayes*, 518 F.2d 675, 678 (6th Cir.1975). Affirmative proof of the likelihood of the destruction of evidence, along with the necessity for warrantless entry are required. *Id.* at 677–78.

At the time of their warrantless entry, the agents did not know whether, in fact, anyone remained at the Scio Church Road residence. However, actual knowledge is not required to support the first prong of the *Sangineto–Miranda* test. The agents need only show that they held "a reasonable belief that third parties [were] inside the dwelling." *Sangineto–Miranda*, 859

F.2d at 1512. Given the heightened level of transient activity witnessed by the agents, we agree with the district court's finding that the first prong of the *Sangineto–Miranda* test was satisfied.

■ Regarding the second prong of the *Sangineto–Miranda* test, the facts in this case fail to support the district court's finding that the DEA agents had an objectively reasonable belief that the destruction of narcotics was imminent. Agent Nelson testified that he decided to effect the warrantless entry based on: the agents' conclusion that the property was actively being used as a shipment point for a drug trafficking organization; and the two law enforcement actions involving Pelkey and Potalivo that had occured off of the property. Transcript at 51–52. He believed that the conspicuous nature of the law enforcement activity in the Scio Church Road area would alert people on the premises that they were under investigation.

We find that the record does not establish an objectively reasonable likelihood that the enforcement activity outside the premises would have come to the attention of anyone who might be on the property. The facts in the case at bar are distinguishable from *Socey* where enforcement actions outside the defendant's residence were visible from within, giving rise to police concern that such commotion would alert those in the house to the police presence. *Socey*, 846 F.2d at 1442; *see Elkins*, 732 F.2d at 1283. Pelkey's arrest, approximately eight miles away from the Scio Church Road dwelling, merely offers the remote possibility of alerting occupants to the ongoing investigation.[4] The secluded location of the property and its abundant vegetation would have made it impossible for its occupants to see the agents' activities on Scio Church Road, including the stop and detention of Potalivo. Although it is theoretically possible that a confederate might have witnessed the law enforcement activity and

---

4. It is mere speculation that the failure of Pelkey and Potalivo to arrive at their respective destinations might have triggered the suspicion that they had been arrested as a result of an ongoing surveillance of the Scio Church Road premises. Therefore, we reject the government's contention that these events supported a reasonable belief that a third party would become aware of the police investigation.

alerted someone on the premises, the record fails to establish that the agents had a factual basis for believing that communication with the house was even possible.[5] The government merely established the *possibility* that evidence would be destroyed as a result of these arrests. The mere possibility of the loss or destruction of evidence is an insufficient basis for the warrantless entry of a house to prevent the destruction of evidence. *Hayes*, 518 F.2d at 678.

■ The length of time required to obtain a warrant also is a factor in determining whether circumstances are exigent. *See United States v. McEachin*, 670 F.2d 1139, 1146 (D.C.Cir.1981). The record, however, fails to establish that the evidence sought "would probably be destroyed within the time *necessary* to obtain a search warrant." *Elkins*, 732 F.2d at 1284 (emphasis added). The seven-hour delay between the warrantless entry of the premises and the acquisition of a search warrant was inordinately long.

The record indicates that the agents had ample time to obtain judicial authorization prior to entering and "securing" the residence. Preparations for a search warrant could have commenced prior to Agent Nelson's decision to proceed with the warrantless entry. The aerial and ground surveillance revealed a heightened level of suspicious activity on the premises as early as 3:45 p.m. on June 23. The activity that led to the pretextual traffic stop of Pelkey also should have led prudent officers to anticipate the need to secure a search warrant for the Scio Church Road dwelling. Instead, such preparations commenced *after* the warrantless entry had been effected. Inadequate law enforcement preparation does not justify warrantless entry.

Agent Nelson testified that he decided to enter and secure the premises after discovering the hashish in Pelkey's car at approximately 9:05 p.m. Transcript at 73. After waiting for the Washtenaw County officers to arrive, he returned to the Scio Church Road residence and effected the warrantless entry at approximately 10:05 p.m. Although the agents were equipped with mobile telephones, no effort was made to contact a United States magistrate prior to the entry. In fact, Magistrate Morgan was initially contacted two hours *after* the entry. Moreover, Agent Ripp utilized nearly four hours to prepare an application for a telephonic search warrant. He finally secured a search warrant from Magistrate Morgan at 4:49 a.m. on June 24, 1987. When considering the time required to obtain a search warrant, instead of the actual time taken in this case, we conclude that a state of exigency did not exist. The agents had ample time to secure a search warrant prior to their entry, and we do not excuse them for their failure to obtain the requisite warrant. These factors, in conjunction with the lack of exigency, lead us to conclude that the trial judge's denial of Radka's motion to suppress cannot stand.

### III.

The warrantless entry of the Scio Church Road dwelling on June 23, 1987 was unjustified by the exigent circumstances exception to the fourth amendment. We do not intimate any view with respect to any other fourth amendment exception or justification for the warrantless search. While the agents had a reasonable belief that the property was occupied, they did not have a reasonable basis to believe that the destruction of evidence was imminent. For the foregoing reasons, we REVERSE the district court's denial of Radka's motion to suppress and REMAND the case to the district court for further proceedings not inconsistent with this opinion.

ALAN E. NORRIS, Circuit Judge, dissenting.

Because the record supports the trial judge's conclusion that law enforcement personnel, confronted with exigent circumstances, had an objectively reasonable basis for believing that loss or destruction of evidence was imminent if the premises were not secured, I respectfully dissent.

---

**5.** In fact, the Scio Church Road residence did not have telephone service.

It seems to me that when the case is viewed in the context of the factual circumstances that actually confronted law enforcement officials, the case law cited by the majority supports affirmance.

Although the majority is willing to credit the trial court's conclusion that the facts warranted a reasonable belief that someone was present on the premises, they do not think the facts are sufficient to ground a reasonable belief that destruction of controlled substances was imminent. This is apparently based upon their conclusion that the "secluded location of the property and its abundant vegetation would have made it impossible for its occupants to see the agents' activities" on the road. That appears to me to stretch and strain the record.

To be sure, there was testimony that the buildings were set back from the road and that agents' view of the buildings was impeded by vegetation. But there was no evidence at all concerning the view of those from inside the enclosure. The trial court made no finding that it was "impossible," and we ought not speculate, particularly since to do so defies common experience. Any tenderfoot knows it is easier to see out of the thicket than into it. Nor was the point argued by defense counsel at the hearing—his argument was based upon lack of evidence that anyone was on the premises.

I assume the view was never put at issue since the government's witness said his concern about discovery arose because "anybody that had been driving by on Scio Church Road in the area would have seen law enforcement activities" on the road, due to the number of law enforcement vehicles and the stop of Potalivo, and any passerby could have contacted an occupant of the house. Contrary to the impression left by the majority, there was no evidence that the officers knew the premises were not served by a telephone. What the government's witness found upon entering the residence was the absence of a telephonic instrument; he very carefully pointed out that he was not saying that the house was without telephone *service*.

The "impossible" view from the house appears to be the only basis for the majority's conclusion that the government failed to satisfy the second prong of *Sangineto-Miranda*, 859 F.2d at 1512. They conclude that while it was reasonable for agents to believe that someone was in the house, it was not reasonable for them to believe that someone could see out through the trees. That's hard to follow, since it would seem as reasonable to think that one in defendant's position would be alert, as it is to believe that he would not be alert. In fact, it is eminently reasonable to assume that he would make it his business to see out. In the absence of evidence that it was impossible for someone to see out from any vantage point within the enclave—from the house or from out among the outbuildings or elsewhere on the grounds—I am hard-pressed to understand why a reasonably objective police officer must assume that such a person would not at least try to peer out now and then. It is undisputed that police activity was there for the seeing. Why were agents required to assume that in the midst of all the illegal hustle and bustle taking place on the premises that day their targets nevertheless would totally relax their guard?

And of course there is no evidence at all that agents' concern about passersby tipping off occupants was ill-founded. Theirs was the only testimony about vehicular traffic. And in addition to the cars driven out of the complex by Pelkey and Potalivo, a third car had been followed to another home nearby and agents were also preparing to search that house. Potalivo was driving defendant's automobile—shouldn't agents have been concerned that the owner would be awaiting its return or word from its driver? Under all these circumstances, it seems to me that only the most obtuse police officer would fail to appreciate the very real risk and form a reasonable belief that occupants would learn that something was afoot and move to destroy evidence.

The majority also suggests that "the agents had ample time to obtain judicial authorization prior to entering and 'securing' the residence." While the implication

is that sufficient facts existed of conduct prior to the Pelkey stop which would have enabled the government to obtain a search warrant, I doubt the majority seriously contends that was the case. Instead, while the government's information up to that point may have suggested a large ongoing drug operation, it was not until Pelkey's car was stopped that the government possessed hard evidence that hashish was being distributed from the Scio Church Road address. But the same time frame that provided this evidence to support the issuance of a warrant also revealed the circumstances pointing to the emergency nature of securing the evidence. There simply was no convenient breather that set in before destruction became imminent.

Agent Nelson said he was required to wait for half an hour for local deputies to come for Pelkey. He then had thirty minutes to transfer the prisoner to the deputies, return the eight or nine miles over country roads to Scio Church Road, acquaint himself with what had transpired there in the meantime—including the arrival of more law enforcement personnel and the detention of Potalivo—and to organize the evidence securing exercise. There is no indication there was also time to obtain a search warrant from far-off Detroit.