**NOT FOR FULL-TEXT PUBLICATION**
File Name: 05a0644n.06
Filed: August 2, 2005

**NO. 03-3148**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**MARY G. JORDAN, individually and as a next
friend of minor children; ANGEL WILLIAMS,**

      **Plaintiffs-Appellants,**

**v.**

**RICHARD MURPHY, et al.,**

      **Defendants,**

**and**

**NICOLE WILLIAMS; LUCAS COUNTY
CHILDREN SERVICES,**

      **Defendants-Appellees.**

_____/

      **ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE NORTHERN
DISTRICT OF OHIO**

**BEFORE: SUHRHEINRICH and GIBBONS, Circuit Judges; and LAWSON, District Judge**[*]

      **SUHRHEINRICH**, Circuit Judge. Plaintiffs-Appellants Mary Jordan and Angel Williams ("Plaintiffs") appeal from the order of the district court granting summary judgment in favor of Defendant-Appellee Nicole Williams ("Williams") and the Lucas County Children Services Board ("LCCSB") on various theories arising under federal and state law. For the reasons that follow, we **AFFIRM** the judgment of the lower court.

**I. Background**

_____

[*]The Honorable David M. Lawson, United States District Judge for the Eastern District of Michigan, sitting by designation.

Mary Jordan ("Jordan") was born on May 11, 1926, and is the mother of sixteen children. She has resided at 2472 Lawrence Avenue in Toledo, Ohio for thirty years. On April 10, 1998, Jordan and her then minor granddaughter, Angel Williams ("Angel"), were at Jordan's house. At the time, Jordan was acting as the legal guardian for Angel and several other children. At approximately eight o'clock in the morning, Jordan responded to a knock on the door by Defendant Officer Sergeant Richard Murphy of the Toledo Police Division. Officer Murphy was investigating a complaint that Jordan's house was filthy and full of trash. He spoke with Jordan on the front porch of the house while Angel stood in the doorway. It is undisputed that Officer Murphy did not enter the house and left after concluding his conversation with Jordan. Although the subject of the conversation is unclear, Jordan testified at her deposition that Officer Murphy was carrying some 'blue papers" and that he informed Jordan he was going to come back with some help.

On April 10, 1998, at approximately twelve-thirty in the afternoon, the LCCSB received a report of possible neglected children at Jordan's residence. The report apparently stated that the house was in deplorable condition and that Jordan was caring for twenty-five children. Williams, a caseworker in the Assessment Department of the LCCSB, was assigned to investigate the report.

Williams went to Jordan's residence where she met Officer Murphy and other Toledo Police Officers. Officer Murphy informed Williams that he had been at Jordan's house earlier in the day and that he had observed that the house was filthy and full of trash. He also informed Williams that he had observed several children in the house.

The police officers allegedly knocked on the front door, but after receiving no answer they proceeded to enter the house through an open side door. Williams followed the officers into the house. It is uncontroverted that the police did not secure a warrant to authorize the entry into

2

Jordan's house. Williams stated in her affidavit that it was the consensus of the personnel at the scene that the children in the Plaintiff's house were in immediate danger because of the deplorable conditions of the house and that removal was necessary to prevent immediate physical harm.

Williams alleges that upon following the police into the house she observed trash, filth, and a very bad odor. Once inside the house, the officers announced their presence and called for Jordan until she came downstairs. The officers informed Jordan that they were there to check on the condition of the children. According to Williams, the children and their clothing were dirty. Williams attempted to explain to Jordan that her house was unsafe and that the children should not be there. However, Jordan and Angel refused to cooperate and, at least initially, would not answer questions relating to the identity of the children. The officers went upstairs and retrieved the children while Jordan stayed on the first floor by the door. When Jordan and Angel attempted to stop the police from taking the children into custody, the officers arrested them both. The children were taken into the custody of the LCCSB, and the Lucas County Juvenile Court eventually placed them in the custody of other relatives.

Jordan alleges that during these events she suffered an injury to her knee when she was knocked into the railing by an officer attempting to climb the stairs. She also alleges that another officer pushed her into a wall or a door and injured her back.

On March 2, 2000, Jordan filed a complaint in the Lucas County Court of Common Pleas (Ohio) on behalf of herself and as next friend of the minor children, against Officer Murphy, Williams, and five additional officers of the Toledo Police Department, all in their individual capacities. She also sued the LCCSB. The complaint asserted claims pursuant to 42 U.S.C. § 1983; state tort claims of assault, battery and false imprisonment; and a civil conspiracy charge. On April

3

5, 2000, the action was removed to the United States District Court for the Northern District of Ohio. On November 6, 2000, Jordan and Angel filed an amended complaint. The complaint asserted the same claims as the original complaint but named Angel as an adult[1] and removed the other minor children as plaintiffs.

On July 24, 2001, Williams and the LCCSB moved for summary judgment. The Toledo Police Officers moved for partial judgment on the pleadings as to the claim of civil conspiracy, and later moved to supplement their original motion. On November 19, 2001, the district court granted the motions, concluding that Jordan's claims of assault, battery, and false imprisonment were barred by the statute of limitations but that Angel's claims were not so barred because she had not reached the age of majority. Additionally, the court held that under Ohio law the LCCSB and Williams were immune from suits based on the state law claims, and that there was no evidence to support the claims. The claims based on civil conspiracy were dismissed because they were not pled with specificity. As to the § 1983 claims, the district court concluded that Plaintiffs failed to plead a federal claim against the LCCSB because *respondeat superior* does not apply to such claims, and that Williams was entitled to qualified immunity.

The district court entered judgment on behalf of Williams and the LCCSB, dismissing the case against them in its entirety. The judgment also dismissed all of Jordan's state law claims against Officer Murphy and the other officers, leaving only the § 1983 claim. With the exception of the conspiracy claim, all Angel's claims against the police officers survived. On November 22, 2002, the plaintiffs settled their surviving claims against the remaining defendants pursuant to a stipulation. The district court dismissed the case with prejudice. On December 16, 2002, the district

---

[1]Angel turned eighteen on November 19, 1999.

4

court entered a final judgment. Jordan and Angel now appeal the district court's rulings as to Williams and the LCCSB.

## II.  Standard of Review

This Court reviews the district court's grant of summary judgment *de novo*. *Ailor v. City of Maynardville, Tennessee*, 368 F.3d 587, 595 (6th Cir. 2004) (citations omitted).   Summary judgment is proper when there is no dispute as to a material issue of fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## III.  Analysis

Appellants raise the following errors on appeal:  1) whether the district court erred in granting summary judgment to Williams on the grounds of qualified immunity for § 1983 claims involving a violation of the Fourth Amendment rights to be free from a warrantless search and  to have officials  "knock and announce" before entering; 2) whether the district court erred in determining that the LCCSB and Williams are immune from liability under the Ohio Political Subdivision Tort Liability Act; 3) whether the district court erred in dismissing claims pursued by Jordan and Angel under a theory of civil conspiracy; and 4) whether the district court erred in granting summary judgment to Williams and the LCCSB on the state law tort claims pursued by Angel because genuine issues of material fact exist.

## A. § 1983 Claims

Plaintiffs claim that the district court erred in granting Williams qualified immunity as to two related Fourth Amendment constitutional violations: a warrantless search and a violation of the knock-and-announce rule.  Qualified immunity is available if, despite a constitutional violation, the right was not clearly established at the time of the defendants' actions.  *See Saucier v. Katz*, 533

U.S. 194, 201 (2001). The dispositive inquiry in determining whether a right is clearly established is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202 (citing *Wilson v. Layne*, 526 U.S. 603 (1999)).

For purposes of qualified immunity analysis, we will assume that Plaintiffs' Fourth Amendment rights were violated.[2] The issue thus becomes whether Williams's actions may nonetheless be excused because a reasonable case worker would not know she was violating clearly established law. *Brennan v. Township of Northville*, 78 F.3d 1152, 1154 (6th Cir. 1996).

We have explained that for a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002) (internal quotations and citations omitted). The objective legal reasonableness standard requires us to analyze whether a case worker in Williams's position objectively would have understood that she "was under an affirmative duty to have refrained from such conduct." *Bills v. Aseltine*, 52 F.3d 596, 603 (6th Cir. 1995) (citing *Brandenburg v. Cureton*, 882 F.2d 211, 215 (6th Cir. 1989)).

Under this fact scenario we believe that a reasonable case worker hearing the police officers' observations and conclusions could have reasonably understood that there was an imminent threat of physical harm to the children inside Jordan's home. After the LCCSB received an anonymous tip, Williams was assigned to investigate whether Jordan was, in fact, caring for up to twenty-five

---

[2]Although neither the Supreme Court nor this Court have explicitly held that the Fourth Amendment does not create a social worker exception, (*see Walsh v. Erie County Dep't of Job & Family Servs.*, 240 F. Supp. 2d 731, 759 (N.D. Ohio 2003)), other circuits have so held. *See Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1205 (10th Cir. 2003)*; Roska v. Peterson*, 328 F.3d 1230, 1240 (10th Cir. 2003); *Doe v. Heck,* 327 F.3d 492, 509 (7th Cir. 2003); *See also Walsh*, 240 F. Supp. 2d at 746-47 (citing *Roska v. Peterson*, 304 F.3d 982, 989 (10th Cir. 2002), *vacated*, *Roska*, 329 F.3d at 1230) (no social worker exception to the strictures of the Fourth Amendment).

children–not all her own–amidst deplorable conditions. Upon her arrival at Jordan's house, Williams relied on the officers' conclusion, based on Officer Murphy's first-hand observations, that there were children inside and that the condition of the house required immediate intervention to prevent imminent physical harm. This conclusion was consistent with the information Williams had received through her agency and was confirmed by the fact that the Lucas County Juvenile Court ultimately placed the children in the custody of other relatives. Police officers made the decision as to why, where, and how to enter Jordan's house. Only after they gained access did Williams follow them inside.

We believe that a reasonable case worker under similar circumstances would have deferred to the police officers' conclusion. While we recognize that state agencies such as the LCCSB have the authority to enter a home and take an endangered child into custody "[p]ursuant to an order of the court . . ." and "[p]ursuant to the laws of arrest" (OHIO REV. CODE § 2151.31(A)(1)-(2)), case workers are also under a duty to conduct their investigations in cooperation with law enforcement officers.[3] Law enforcement officers have a duty to make, and are accustomed to making, Fourth Amendment decisions. Case workers should not have to second guess officers' decisions, particularly where the police have told them that children are in imminent physical danger.

Given Williams's reasonable reliance on the police officers, her statutory duty to investigate reports of abuse and neglect, and her statutory duty to cooperate with the police, we conclude that a reasonable case worker in Williams's position would not have understood her actions as violating

---

[3]Section 2151.421 of the Ohio Revised Code states that "a public children services agency shall investigate, within twenty-four hours, each report of known or suspected child abuse or child neglect" and that "[t]he investigation shall be made in cooperation with the law enforcement agency." OHIO REV. CODE ANN. § 2151.421(F)(1) (West 2004).

7

clearly established law.[4]  Therefore, we affirm the district court's grant of summary judgment to

Williams on the § 1983 claims.

## B.  Ohio Political Subdivision Tort Liability Act

Appellants contend that the district court erred in granting summary judgment to Williams

and the LCCSB under the Ohio Political Subdivision Tort Liability Act.  *See* OHIO REV. CODE ANN.

§ 2744.02 (West 2004).

The Act sets forth a three-tiered analysis for determining whether a political subdivision is

immune from liability.  *See Cater v. City of Cleveland,* 697 N.E.2d 610, 615 (Ohio 1998*).*  First,

section 2744.02(A) sets forth the following general rule of immunity:  "[A] political subdivision is

not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused

by any act or omission of the political subdivision or an employee of the political subdivision in

connection with a governmental or proprietary function." § 2744.02(A)(1).  Under the second tier,

the immunity afforded a political subdivision is subject to five exceptions listed in section

2744.02(B).  *Cater*, 97 N.E.2d at 615.  Finally, under the third tier of analysis, immunity can be

reinstated if the political subdivision can successfully argue that one of the defenses contained in

section 2744.03 applies.  *Id.*

### 1.  LCCSB's Immunity

It is undisputed here that the LCCSB falls under the definition of a political subdivision.  We

next look to whether Plaintiffs can establish that one of the five specific statutory exceptions applies.

---

[4]Cases such as *Calabretta v. Floyd*, 189 F.3d 808 (9th Cir. 1999), and *Walsh v. Erie County Dep't of Job & Family Servs.*, 240 F. Supp. 2d 731 (N.D. Ohio 2003), have denied social workers qualified immunity.  However, these cases are distinguishable from the present one because, in both, the social worker was in command of the investigation and used police to assist in entry.  In the present case, police directed the entry.

As the district court notes, Plaintiffs neither state in their amended complaint nor suggest in their opposition to summary judgment motion that any exceptions apply in this instance. Therefore, it is unnecessary to address whether the LCCSB can claim any defenses. The LCCSB is entitled to immunity under section 2744.02.

## 2. Nicole Williams's Immunity

Under section 2744.03 of the Ohio Revised Code, an employee of a political subdivision is also immune from civil liability unless one of the following exceptions applies:

> (a)The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
> (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in wanton or reckless manner;
> (c) Liability is expressly imposed upon the employee by a section of the Revised Code.[5]

§ 2744.03(A)(6).

Plaintiffs argue that exception (c) applies, and point to sections 2921.45 and 2911.21 of the Ohio Revised Code. Section 2921.45 states that "[n]o public servant, under color of his office, employment, or authority, shall knowingly deprive, or conspire or attempt to deprive any person of a constitutional or statutory right." OHIO REV. CODE § 2921.45(A). Violation of section 2921.45 is a misdemeanor in the first degree. § 2921.45(B). Plaintiffs claim Williams violated section 2921.45 by making a warrantless entry and by failing to knock and announce her presence prior to entering.

Section 2911.21 states that "[n]o person, without privilege to do so, shall . . . [k]nowingly enter or remain on the land or premises of another." OHIO REV. CODE § 2911.21(A)(1).

We conclude that section 2911.21 does not apply because it is a general liability statute that

---

[5]The current version of § 2744.03(A)(6)(c) states that, "[c]ivil liability is expressly imposed upon the employee." § 2744.03(A)(6)(c) (emphasis added).

does not expressly impose liability on a particular group. We agree, however, that the exception applies since section 2921.45 expressly imposes liability upon a particular class of persons, namely public servants, for a particular kind of activity.[6] Regardless of the statute's applicability, however, Plaintiffs cannot prevail under it. Section 2921.45 imposes liability only if the constitutional violation was "knowing." As we stated in our qualified immunity analysis, the undisputed evidence reflects that Williams reasonably relied on Officer Murphy's assessment of the deplorable conditions and the police officers' judgment in entering Jordan's home without a warrant. Since there is no proof in the record that Williams knowingly violated Plaintiffs' Fourth Amendment rights, Plaintiffs have not established an exception to immunity. Therefore, the district court properly granted Williams immunity under the Ohio Political Subdivision Tort Liability Act.

### C. Civil Conspiracy and State Law Claims

Plaintiffs allege that the district court erred in dismissing their civil conspiracy claim. Angel alleges that the district court erred in dismissing her claims for assault, battery and false imprisonment. Since Plaintiffs concede that Williams did not engage in any conduct that would constitute assault, battery, or false imprisonment, but rather, contend that there is a factual dispute regarding whether she conspired with others to commit these wrongful acts, we analyze both the conspiracy claim and the state law claims together. We hold that there is no evidence linking Williams to a civil conspiracy to commit assault, battery or false imprisonment.

---

[6]We recognize that Ohio courts have declined to find an exception to immunity where the statute relied on is a statute of general liability. *See, e.g., Bundy v. Five Rivers Metroparks*, 787 N.E.2d 1279 (Ohio Ct. App. 2003) ("*no person* who is the owner or keeper of horses or mules"–R.C. 951.02) (emphasis added); *Ratcliff v. Darby*, No. 02CA2832, 2002 WL 31721942 (Ohio App. 4 Dist. Dec. 2, 2002) ("*no person* shall knowingly cause another to believe that the offender will cause him serious physical harm" - R.C. 2903.21(A) (emphasis added). However, unlike the general liability statutes in *Bundy* and *Ratcliff,* the statute at issue here does not apply to all persons, but rather, to a specific class of persons, i.e. "public servants."

10

Under Ohio law, civil conspiracy is defined as a "'malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages.'" *Kenty v. Transamerica Premium Ins. Co.*, 650 N.E.2d. 863, 866 (Ohio 1995) (quoting *LeFort v. Century 21-Maitland Realty Co.*, 512 N.E.2d 640, 645 (Ohio 1987)). Thus, to establish a claim of civil conspiracy, a plaintiff must show: "(1) malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy." *Aetna Cas. & Sur. Co. v. Leahey Const.* Co., 219 F.3d 519, 534 (6th Cir. 2000) (citation omitted). A "conspiracy claim must be pled with some degree of specificity, and vague or conclusory allegations that are unsupported by material facts will not be sufficient to state a claim." *Avery v. Rossford, Ohio Transp. Improv. Dist.*, 762 N.E.2d 388, 395 (Ohio Ct. App. 2001).

Plaintiffs have not provided evidence that Williams encouraged or incited an assault, battery or false arrest. Plaintiffs cite Williams's entry into Jordan's house without a warrant. They claim that Williams agreed with the police officers to jointly enter the house and take possession of children inside, and that, once inside, Williams insisted the children be brought to her. They further claim that the alleged assault, battery, and false imprisonment occurred as a result of this insistence.

We have already established that Williams reasonably relied on Officer Murphy's assessment that deplorable conditions justified entry into the house without a warrant, an assessment that was later confirmed when the Lucas County Juvenile Court placed the children in the custody of other relatives. The record shows that once inside the home, Williams remained on the first floor of the house near the door and did not go upstairs. She requested to check the children, as was her duty, particularly in light of the information provided to her agency and the fact that Plaintiffs initially refused to reveal the children's identity. Plaintiffs have offered no proof that in insisting to see the

children Williams understood that assaults, physical contact, or arrests of Plaintiffs were planned, that she intended the police to act in such a manner, or that she acquiesced in any subsequent police behavior to carry out such acts. That conduct properly was attributed to the police officers, if to anyone, but not to Williams. Therefore, Plaintiffs have not established the elements of conspiracy. Since there is no evidence against Williams, LCCSB is not liable under the theory of *respondeat superior*. Given our disposition regarding the merits of Plaintiffs' conspiracy claim, we need not address the district court's determination that Plaintiffs did not plead conspiracy with sufficient specificity. Therefore, we affirm the district court's decision to grant summary judgment to Williams and the LCCSB on both the conspiracy claim and Angel's state law claims.

## IV. Conclusion

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

DAVID M. LAWSON, District Judge, concurring in part and dissenting in part. I concur in the opinion of the court affirming the dismissal of plaintiffs' state law claims. However, because I believe that the record presents a genuine issue of material fact on whether a reasonable officer would have concluded that a warrantless home entry was lawful under the circumstances Nicole Williams confronted, I dissent from section III(A) of the court's opinion affirming the dismissal of the section 1983 claim based on qualified immunity.

I.

This court has held that the qualified immunity question requires an analysis that proceeds through three steps that are fact-intensive, since the inquiry calls for an assessment of the officer's conduct "in the situation he confronted." *Sample v. Bailey*, 409 F.3d 689, 698 (6th Cir. 2005) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). Therefore, I will take a moment to review the facts summarized above by my colleague.

On April 10, 1998, Ms. Jordan lived in a home located at 2472 Lawrence Avenue in Toledo, Ohio with her sixteen-year-old granddaughter, appellant Angel Williams, and several other minor children. At the time, Jordan was acting as the legal guardian for the minor children and her granddaughter. Jordan was born on May 11, 1926, was widowed in 1990, is the mother of 16 children, and has lived at the Lawrence Avenue residence for over 30 years.

At approximately eight o'clock in the morning on April 10, 1998, Jordan responded to a knock on the door by defendant Officer Richard Murphy of the Toledo Police Department. Murphy was investigating a complaint that the residence was unsafe and unsanitary. He spoke with Jordan on the front porch of the house for approximately ten minutes while Angel stood in the doorway. Murphy did not enter the house and left after concluding his conversation with Jordan. Although it

13

is not entirely clear from the record what the two individuals discussed, Jordan did testify at her deposition that Murphy was carrying some "blue papers" and that he informed Jordan before he left that he was going to get more help and would be back.

At approximately twelve-thirty that afternoon, the Lucas County Children Services Board received a report of possible neglected children at Jordan's residence. The report stated that Jordan's house was in a deplorable condition, Jordan was caring for twenty-five children, and several children were seen looking out the windows of the house. Nicole Williams, one of the defendants in this case, was the social worker in the Assessment Department of the Children Services Board assigned to investigate the report. Williams went to Jordan's residence where she met six Toledo Police Officers, including Murphy. Murphy informed Williams that he had been at Jordan's house earlier in the day to investigate complaints that Jordan's house was in an unsafe and filthy condition. Murphy also told Williams that he had observed several children in the house, and that the house was full of trash.

Nicole Williams stated in her affidavit that it was the consensus of the personnel at the scene that the children in Jordan's house were in immediate danger because of the deplorable conditions and that the removal of the children was necessary to prevent immediate physical harm. The police officers allege that they first knocked on the front door, but after receiving no answer they entered through an open side door. Williams followed the officers into the house through the side door. Jordan and her granddaughter Angel, however, deny that the officers or Williams knocked on the door before entering. Williams states in her affidavit that upon entering the house, she observed trash and filth and smelled a very bad odor. It is undisputed that a warrant was not obtained to authorize the entry of Jordan's home or the seizure of the children.

14

Once inside the house, the officers announced their presence and called for Jordan and Angel until they came downstairs. The officers informed the women that they had come to check on the condition of the children in the house. Williams observed two young children downstairs. The police officers went upstairs and found two naked children in the upstairs bedrooms. According to Williams, the children and their clothing were dirty. Williams explained to Jordan that her house was unsafe and that the children should not be there. The police officers dressed the children and took them into the custody of the Children Services Board. Williams stated in her affidavit that Jordan refused to answer her questions relating to the identity of the children and attempted to stop the police from taking the children into custody. The officers arrested both Jordan and Angel. Williams claims that the entire time she was in the house she stayed on the first floor by the entry door. The Lucas County Juvenile Court eventually placed the children in the custody of other relatives.

Jordan alleges that one of the officers knocked her into a railing causing injury to her knee as the officer was climbing the stairs in her house. She also alleges that another officer pushed her into a wall or a door and injured her back. She also contends that Williams' warrantless entry into her home violated her rights under the Fourth Amendment. Williams pleaded qualified immunity as a defense, which the district court sustained on summary judgment.

II.

Qualified immunity is an affirmative defense that protects government actors performing discretionary functions from liability for civil damages when their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The purpose of this defense is to strike a balance that "accommodates the tension between permitting litigants to recover damages, which is often the

15

only realistic avenue for vindication of constitutional guarantees, and the social costs of such suits, including the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004) (internal quotes and citation omitted).

The Supreme Court has held that a claim of qualified immunity must be examined in two stages, *see Saucier v. Katz*, 533 U.S. 194, 200 (2001): first, it must determine whether the facts alleged, viewed in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right. *Id.* at 201 (noting that where the facts are in dispute, the proper inquiry is whether "a violation could be made out on a favorable view of the parties' submissions"); second, if a constitutional violation is found, the court proceeds to determine whether the party's right to be free from the violation was "clearly established" at the time of the violation such that a reasonable public official would understand it as such. *Ibid.* This court has expanded that inquiry into a three-step sequential analysis, at least when the qualified immunity defense is raised in a summary judgment motion brought after discovery has been conducted, as here. *See Sample*, 409 F.3d at 696 & n.3.

> First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence 'to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.'

*Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (quoting *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir.1999) (en banc)); *see also Tucker v. City of Richmond, Ky.*,  388 F.3d 216, 220 (6th Cir. 2004); *Champion*, 380 F.3d at 901.

16

The district court concluded that the plaintiffs "failed to establish the violation of a clearly established right." J.A. at 83. It is not apparent from this holding, however, whether the court concluded that no constitutional right was violated, or that the right, although violated, was not clearly established. The plaintiffs argue that Williams violated the Fourth Amendment in two respects: she participated in a warrantless entry that was unreasonable, and she acted in concert with the police who violated the "knock and announce" rule. The majority assumed without deciding that a constitutional right was violated. However, to properly analyze the defense of qualified immunity, the "contours" of that right must be examined.

A.

The Fourth Amendment states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." In *Payton v. New York*, 445 U.S. 573 (1980), the Supreme Court reasserted that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Id.* at 585. That is "[b]ecause 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion' stands '[a]t the very core of the Fourth Amendment.'" *Groh v. Ramirez*, 540 U.S. 551, 558 (2004) (quoting *Kyllo v. United States*, 533 U.S. 27, 31 (2001)). Accordingly, to "minimize[] the danger of needless intrusions" into the "sanctity of the home," *Payton*, 445 U.S. at 586, 601, the Fourth Amendment requires a warrant issued by a judicial officer – a "neutral and detached magistrate." *Johnson v. United States*, 333 U.S. 10, 14 (1948). The Supreme Court has consistently held that only "reasonable" searches are allowed by the Fourth Amendment, and that searches without a warrant are "*per se* unreasonable" except in a few well-defined and carefully circumscribed instances. *Katz v. United States*, 389 U.S. 347, 357 (1967). In

17

the case of a person's home, warrantless entries and searches are "presumptively unreasonable."

*Payton*, 445 U.S. at 586.

Williams and the police officers were operating under the authority of section 2151.31 of the Ohio Revised Code when they entered Jordan's home. That statute states:

> (A) A child may be taken into custody in any of the following ways:
>    (1) Pursuant to an order of the court . . .
>    (2) Pursuant to the laws of arrest;
>    (3) By a law enforcement officer or duly authorized officer of the court when any of the following conditions are present:
>    (a) There are reasonable grounds to believe that the child is suffering from illness or injury and is not receiving proper care . . . and the child's removal is necessary to prevent immediate or threatened physical or emotional harm;
>    (b) There are reasonable grounds to believe that the child is in immediate danger from the child's surroundings and that the child's removal is necessary to prevent immediate or threatened physical or emotional harm;
>    (c) There are reasonable grounds to believe that a parent, guardian, custodian, or other household member of the child's household has abused or neglected another child in the household and to believe that the child is in danger of immediate or threatened physical or emotional harm from that person.
>    . . .
>
>    (6) By a law enforcement officer or duly authorized officer of the court when any of the following apply:
>    (a) There are reasonable grounds to believe that the conduct, conditions, or surroundings of the child are endangering the health, welfare, or safety of the child.

Ohio Rev. Code § 2151.31(A). However, social workers also must abide by the strictures of the Fourth Amendment when removing a child from a home. *See Cherrington v. Skeeter*, 344 F.3d 631, 638 (6th Cir. 2003) (holding that removal of children from custody of legal guardian should be analyzed under the Fourth Amendment reasonableness standard); *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1240 (10th Cir. 2003) (holding that a warrantless no-knock entry by social workers violated the Fourth Amendment absent exigency of imminent danger to child's welfare); *Brokaw v. Mercer County*, 235 F.3d 1000, 1010 (7th Cir. 2000) (holding that a child taken out of a home by a

18

government official was seized within the meaning of the Fourth Amendment); *Tenenbaum v. Williams*, 193 F.3d 581, 601-06 (2d Cir. 1999) (analyzing seizure of a child by the State during an abuse investigation under the Fourth Amendment); *Calabretta v. Floyd,* 189 F.3d 808, 816 (9th Cir. 1999) (stating that a social worker must have a warrant to enter a home to remove a child absent consent or exigency); *Lenz v. Winburn,* 51 F.3d 1540, 1547 (11th Cir. 1995) (stating that even though social worker's intrusion was motivated by concern for child's welfare, "and not as part of any investigation, the search falls within the ambit of the Fourth Amendment").

As mentioned previously, it is undisputed that neither Williams nor the police officers had obtained a warrant authorizing the entry into Jordan's home. They justified the entry on the basis of their belief that the home was unfit for children. However, the Supreme Court has consistently held that absent a warrant, probable cause alone will not suffice to sanction an entry into a dwelling. *Kirk v. Louisiana*, 536 U.S. 635, 636-37 (2002) (per curiam). Probable cause must be accompanied by exigent circumstances or some other exception to the warrant requirement in order to make the entry constitutional. *Id.* at 637; *United States v. Lewis*, 231 F.3d 238, 241 (6th Cir. 2000).

Exigent circumstances – *i.e.*, the existence of an emergency situation demanding immediate action, *United States v. Radka*, 904 F.2d 357, 361 (6th Cir. 1990) – may excuse the failure to procure a warrant to enter a home. Some of the exceptions to the warrant requirement recognized by the Supreme Court include home entries and searches pursuant to consent, searches incident to a lawful arrest, seizures of objects in plain view, searches and seizures in pursuit of a fleeing felon, and seizures to prevent the loss or destruction of evidence. *Id.* at 360 n.3.

Another recognized exception to the warrant requirement centers around exigent circumstances in which the safety of the police or others within a home is in peril. *See United States*

*v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994). For instance, in *Minnesota v. Olson*, 495 U.S. 91 (1990), the Supreme Court endorsed the lower court's analysis of whether exigent circumstances existed in that case to justify the warrantless entry into a home that was surrounded by police in order to arrest a murder suspect who appeared to be preparing to flee. The Court agreed that the "risk of danger to the police or to other persons inside or outside the dwelling" could constitute an exigent circumstance, but found that the exigency did not exist in that case. *Id.* at 100. In *Mincey v. Arizona*, 437 U.S. 385 (1978), the Supreme Court rejected a general "murder scene" exception to the warrant requirement. However, the Court also stated that the police have a "right" to respond to "emergency situations," and that the "Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." *Id.* at 392.

Nicole Williams contends that since it was undisputed that she believed the children in Jordan's home were in immediate danger, exigent circumstances existed and legitimatized her entry into the residence without a warrant. Williams subjective belief, however, is irrelevant because the assessment of the exigency must be based on the belief of a reasonable officer under the circumstances, which is an objective standard. *See Anderson v. Creighton*, 483 U.S. 635, 641 (1987) (holding that the police officers subjective beliefs about the search in question were irrelevant).

The record reflects that Williams first learned of this case of possible child neglect from an anonymous report stating that Jordan's house was in deplorable condition and that she was caring for twenty-five children. Williams went to Jordan's residence to investigate the complaint as a "duly authorized officer of the court" in accordance with Ohio law. *See* Ohio Rev. Code. § 2141.421(F)(1).

20

There she met police officers, including Officer Murphy who had been at the residence an hour earlier. Murphy told Williams that he observed the house to be filthy and full of trash.

Williams asserts that it was the consensus of the personnel present that the children in the house were in immediate danger because of the deplorable condition of the house and that removal of the children was necessary to prevent immediate physical harm. However, the only evidence of danger that Williams has produced, other than her conclusory assertions, is a report that the house was in deplorable condition and Murphy's statement that the house was filthy and full of trash. Williams does not explain how the presence of trash and filth caused a danger to the children that was so immediate that a warrant could not be sought from a neutral judicial officer. Officer Murphy had virtually the same information an hour earlier yet did not seek judicial authorization to remove the children despite ample time in which to obtain a warrant.

For their part, the plaintiffs averred that the house was in habitable condition, the lights and electrical outlets were in good working order, all of the appliances and toilets worked properly, there was heat, hot water and smoke detectors, and no dangers existed. Based on facts taken in the light most favorable to the plaintiffs, I would conclude that the plaintiffs proved, sufficiently to survive summary judgment, that their constitutional right to be free of a warrantless home intrusion was violated because no valid excuse for failing to seek a warrant was established.

B.

The majority concluded that Nicole Williams should avoid liability for violating the plaintiffs' constitutional rights because it was reasonable, in its view, for Williams to defer to the decision of the police officers and follow them into the house without a warrant. It suggests that case workers have less experience than police officers when dealing with the requirements of the Fourth

21

Amendment, so that the illegality of following the lead of the police and entering the plaintiffs' home, even when there was ample time to obtain a warrant, was beyond Williams' understanding.

However, I gather from the submission of the parties that it is not unusual for social workers in the employ of the Lucas County Children Services Board to confront situations in the field that require the removal of children from their homes. Although they must cooperate with the police, as the majority notes, case workers who are called upon to enter the private dwellings of citizens in their region must bear some measure of personal responsibility for knowing when prior judicial approval is required to sanction their actions, and when an emergency will excuse an immediate, warrantless response. The law of qualified immunity draws that line by holding state actors (including case workers) responsible for violating constitutional rights that are "clearly established."

"For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotes and citations omitted). "[A] right can be clearly established even if there is no case involving 'fundamentally similar' or 'materially similar' facts if the premise of a prior case alerts officials to the 'clear applicability' of the legal principle to 'a subsequent set of facts.'" *Scicluna v. Wells*, 345 F.3d 441, 446 (6th Cir. 2003) (quoting *Feathers v. Aey*, 319 F.3d 843, 850 (6th Cir. 2003)).

Fourth Amendment jurisprudence firmly establishes the constitutional protections that honor the sanctity of the home. Nicole Williams, as a public official, had fair notice that her entry would be unlawful in the absence of a warrant or exigent circumstances. This court has held that the public

22

official must establish an exception to the warrant requirement by "clear and positive proof." *United States v. Jones*, 641 F.2d 425, 429 (6th Cir. 1981) (consent search). To satisfy her "heavy burden" to establish exigent circumstances, the official must do more than demonstrate "the mere possibility" that an exigency exists. *Radka,* 904 F.2d at 362; *see also Jones*, 641 F.2d at 428-429. The test is an objective one: the public official must be able to point to "specific and articulable facts" at "the moment of the warrantless entry" that would lead a reasonable, experienced officer to believe that someone inside the dwelling required immediate assistance. *United States v. Morgan*, 743 F.2d 1158, 1162, 1163 (6th Cir. 1984).

Viewing the evidence in the light most favorable to the plaintiff, I do not believe that there was sufficient proof of exigency – that is, an emergency resulting from the conduct, conditions, or surroundings of the children that would endanger their health, welfare, or safety before a warrant could be sought – to permit summary dismissal of the federal claim against Nicole Williams. Williams reasonably may have perceived that the condition of Jordan's home ultimately would justify a finding under Ohio law that supported the removal of the children. But entry of a private dwelling, especially to remove the occupant's children, plainly has been recognized as a serious intrusion that must be authorized by a neutral and detached judicial officer unless an emergency clearly exists. There is a factual dispute over the question of the existence of exigent circumstances. Summary judgment for Nicole Williams on the basis of qualified immunity was not appropriate. *See Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir.), *cert. denied* 534 U.S. 1071 (2001) (stating that "[s]ummary judgment is not appropriate if there is a genuine factual dispute relating to whether the defendants committed acts that allegedly violated clearly established rights").

Similarly, Jordan and Angel Williams testified at deposition and filed affidavits asserting that the officers did not knock on the door or identify themselves before entering Jordan's home. Nicole Williams insists that the officers knocked on the front door before entering through an open side door. Jordan stated that earlier in the day, Officer Murphy knocked on the door and she answered it. The facts are in dispute as to whether the officers and Williams knocked and announced their presence before entering the premises.

The knock-and-announce rule is a clearly established feature of Fourth Amendment jurisprudence and is one measure of the reasonableness of searches and seizures. *United States v. Banks*, 540 U.S. 31, 36 (2003). The Supreme Court has stated that requirement is not absolute, but rather "the common law knock-and-announce principle is one focus of the reasonableness enquiry[] and . . . although the standard generally requires the police to announce their intent to search before entering closed premises, the obligation gives way when officers have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or . . . would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *Ibid.* (citations and footnote omitted).

Exigent circumstances may justify a departure from the knock-and-announce requirement. *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996) (stating that "it is clearly established law that the fourth amendment forbids the unannounced, forcible entry of a dwelling in the absence of exigent circumstances"). "This Court has determined that exigent circumstances relieve officers of the knock-and-announce requirement . . . when . . . the officers have a justified belief that someone within is in imminent peril of bodily harm." *United States v. Dice*, 200 F.3d 978, 983 (6th Cir. 2000)

(citing *United States v. Finch*, 998 F.2d 349, 353 (6th Cir. 1993).   As with a warrantless entry, the burden of proof is on the public official to show exigent circumstances.  *Ibid.*

The same facts that excuse the requirement to obtain a warrant to enter a house may also support the suspension of the knock-and-announce rule.  However, as previously noted, in this case those facts are in dispute.  That fact dispute should preclude a finding that the defendant was entitled to qualified immunity from liability for this alleged constitutional violation.

## III.

Because I believe that when the facts are viewed in the light most favorable to the plaintiffs a constitutional violation has been shown to have occurred, the constitutional right was clearly established and one of which a reasonable person would have known, and the plaintiffs have offered sufficient evidence to indicate that what Ms. Williams allegedly did was objectively unreasonable in light of the clearly established constitutional rights, I must respectfully dissent from that portion of the majority's opinion that affirms the dismissal of the plaintiffs' section 1983 claim.